**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
——————————————————————x

**UNITED STATES OF AMERICA,**


          **-v-**                                              **Case No.        19-CR-245 (SJF)**

**VALERIE CINCINELLI**

                    **Defendant.**
——————————————————————x



**DEFENDANT'S MEMORANDUM OF LAW**
**IN SUPPORT OF BAIL PENDING TRIAL**




James Kousouros
260 Madison Avenue, 22nd Floor
New York, New York 10016
Tel: (212) 532-1934
Fax: (212) 532-1939
James@kousouroslaw.com
*Attorney for Ms. Cincinelli*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................................1

TABLE OF AUTHORITIES .........................................................................................................2

LIST OF EXHIBITS.......................................................................................................................3

PRELIMINARY STATEMENT.....................................................................................................5

BACKGROUND .............................................................................................................................5

THE LAW ON PRE-TRIAL DETENTION ...............................................................................9

THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND POTENTIAL PUNISHMENT ... 12

HISTORY AND BACKGROUND, EMPLOYMENT, AND COMMUNITY TIES OF VALERIE CINCINELLI .............................................................................................................. 19

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

Stack v Boyle, 342 U.S. 1 (1951) ................................................................................. 9

United States v Chimurenga, 760 F.2d 400, 403 (2d Cir. 1985) ................................ 10

United States v Frampton, 383 F.3d 213, 218-2019(2d Cir. 2004) ........................... 16

United States v Paulino, 335 F. Supp. 3d 600 (2018)................................................. 9

United States v Sabhnani, 599 F.3d 215 (2d Cir. 2010) ............................................. 6

United States v Shakur, 817 f.2d 189, 195 (2d Cir. 1987)........................................ 10

United States v Montalvo-Murillo, 495 U.S. 711 (1990) ........................................... 9

United States v Salerno, 481 U.S. 739 (1987) ........................................................... 9

United States v Scarpa, 815 F. Supp. 88 (1993) ........................................................ 9

**Statutes**

18 U.S.C. § 1958 (a) ................................................................................................... 6

18 U.S.C. § 3142........................................................................................................ 5, 8

18 U.S.C. § 3142 (g) ................................................................................................... 11

18 U.S.C. § 3142(b)(1)(c) ........................................................................................... 11

18 U.S.C. § 3142(g)(4) ............................................................................................... 11

18 U.S.C. §1512(e) ...................................................................................................... 8

## LIST OF EXHIBITS

**Exhibit A:**    Complaint

**Exhibit B:**    Detention Hearing Transcript

**Exhibit C:**    Detention Memorandum by the United States

**Exhibit D:**    Certificate of Disposition

**Exhibit E:**    Order of Dismissal

**Exhibit F:**    Order of Protection in Favor of Valerie Cincinelli

**Exhibit G:**    Unfounded Child Abuse Complaint

**Exhibit H:**    Text Message Screenshot

**Exhibit I:**    Text Message Screenshot

**Exhibit J:**    NYS Unified Court System WebCrims Summary

**Exhibit K:**    New York Daily News Article

**Exhibit L:**    Training Certificates & Awards

**Exhibit M:**    Soldier of the Year Award

**Exhibit N:**    Domestic Incident Reports

**Exhibit O:**    Orders of Protection

**Exhibit P:**    Office of the District Attorney, Nassau County Letter

**Exhibit Q:**    Anger Management Referral

**Exhibit R:**    Order of Custody and Parenting Time

**Suretor Documents**

**Exhibit S**:      Valerie Cincinelli Documentation

**Exhibit T**:      Sal and Danielle Cincinelli Documentation

**Exhibit U**:       James and Patricia Baxter Documentation

**Exhibit V**:      Michael and Deborah Kosta Documentation

**Exhibit W:**      Sal Cincinelli Documentation

**Exhibit X:**      Danielle Cincinelli Documentation

**Exhibit Y:**      Louis B. Cincinelli Documentation

**Exhibit Z:**      Louis M. Cincinelli Documentation

**Exhibit AA:**     Nicholas Cincinelli Documentation

**Exhibit BB:**     Richard Sautner Documentation

**Exhibit CC:**     Michael Kosta Documentation

**Exhibit DD:**     Patricia Baxter Documentation

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
_____x

**UNITED STATES OF AMERICA,**


                    -v-                                    **Case No.      19-CR-245 (SJF)**

**VALERIE CINCINELLI,**

                        **Defendant.**
_____x


## PRELIMINARY STATEMENT

Defendant Valerie Cincinelli submits this Memorandum of Law in support of her application for pre-trial release on conditions pursuant to 18 U.S.C. § 3142. It is respectfully submitted that Ms. Cincinelli does not pose an actual risk of flight, is not a danger to the community, and that there are conditions of release which will assure her full compliance with this Court's directives to appear and to answer the charges herein. Accordingly, we ask that pre-trial release be granted in this case and that a bond in the amount of $1,500,000.00 be set by the Court secured by the properties and suretors listed below and strict pretrial conditions, including the surrender of all travel documents, travel restrictions to the Eastern, and Southern Districts of New York, strict pre-trial supervision including home detention, electronic monitoring and restricted computer and cell phone use. Her father, a retired lieutenant in the NYPD has agreed to move in with Ms. Cincinelli should she be released.


## BACKGROUND

On May 17, 2019, Valerie Cincinelli was arrested on a complaint and charged with a violation of Title 18, United States Code, Sections 1958 (a) and 2 (See, Complaint, 19 MJ 474, attached hereto as **Exhibit A**). The complaint charged Ms. Cincinelli with attempting to cause or causing another to travel across state lines and using a facility in interstate commerce, with the intent that one or more murders be committed as consideration for the receipt of and consideration for a promise and agreement to pay something of pecuniary value. A detention hearing was

conducted before the Honorable Anne Y. Shields, United States District Court Judge on May 17, 2019 (See, Detention Hearing Transcript, attached hereto as **Exhibit B**).

In support of the government's application for detention pending trial, the government submitted a detention memo for the Court's consideration prior to the arraignment (See, Detention Memorandum, attached hereto as **Exhibit C**). In the government's detention memo, the government acknowledged that it bears the burden of proving dangerousness by clear and convincing evidence (See, **Exhibit C**, page 3; *citing*, United States v Sabhnani, 599 F.3d 215 (2d Cir. 2010).[1] The government maintained that any release on bail would pose a danger to the safety of the intended victims and that there was a risk that Ms. Cincinelli would attempt to obstruct justice. This was predicated on the information provided by John Dirubba, bank records, and recordings made by Dirubba in May, 2019 during which it is alleged that the plot was discussed.

The government alleged that Ms. Cincinelli proposed the murder for hire plot to her boyfriend in February, 2019 and that he agreed to find someone to kill Ms. Cincinelli's estranged husband and his own daughter. Thereafter, also allegedly in February, 2019, Ms. Cincinelli withdrew $7,000.00 from her bank account and gave it to her boyfriend, who in turn converted the cash to gold coins worth $6,935.00, presumably to pay the hitman. It is alleged that the boyfriend and Ms. Cincinelli discussed the murder for hire plot both in person and over phone and that "some" of these discussions were consensually recorded by Dirubba at the direction of law enforcement.

It appears, however, that Dirubba did not report this alleged plot to the authorities until May, 2019, approximately three months after it was allegedly proposed and paid for. On the date of Ms. Cincinelli's arrest, Dirubba showed her a photograph – which was staged by the authorities - depicting the murder of her estranged husband. It is alleged that she told Dirubba to delete the messages and photographs.

With regard to Ms. Cincinelli's personal history, the memo cited her prior relationships and erroneously asserted that her first husband had obtained an order of protection against her in 2014. The detention memo further noted, erroneously, that her second husband (and one of the victims in this case) had an order of protection against Ms. Cincinelli. As will be demonstrated,

---

[1]This citation is actually to the Sabhnani decision appealing the conviction and not to the bail determination. Of note, the Court had previously *granted* Sabhnani's request for release pending sentence after his conviction for crimes of violence, citing the exceptional circumstances of permitting the defendant to arrange for the affairs of his business and family's financial affairs for the benefit of his children. This and other cases are discussed below.

*infra*, the only orders of protection relating to both Ms. Cincinelli's first common law husband and her second husband were in *her favor*.[2] The government further noted that "while [Ms. Cincinelli] is a New York City Police Officer" she has been brought up on charges, some of which were founded by the department in 2017. As will be demonstrated, *infra*, those charges were based on allegations that John Dirubba – the government's main witness in this case - has admitted under oath and on more than one occasion were fabricated for his own twisted motivations and benefit.

At the detention hearing the government reiterated the arguments made in the detention memo, and further amplified the presentation with allusions to prior "volatile relationships" which preceded the events in question. In support of this allusion to Ms. Cincinelli's purported volatility the Government once again cited orders of protection purportedly lodged against her, and implied that she had a history of aggression toward others with whom she had relationships (**Exhibit B**, page 4-5). The Court noted its understanding that the only order of protection in Ms. Cincinelli's favor was with respect to her "current" boyfriend (**Exhibit B**, page 6). The government further relied on the fact that while Ms. Cincinelli was employed as a New York City police officer she had been disciplined in 2017 and was currently on modified duty (**Exhibit B**, page 8). Once again, as will be discussed, *infra*, the government's reliance on these alleged facts was misplaced. The government also stressed that this "plot" was hatched within Ms. Cincinelli's home and that "any suretor that the defendant might propose for a risk of flight doesn't then equal a safety to the community" (**Exhibit B**, page 7).

As Ms. Cincinelli had been arrested only hours before the detention hearing, defense counsel was not in a position to investigate the allegations or rebut the government's view of the evidence. Counsel cited Ms. Cincinelli's personal history and presented a bail package supported by Ms. Cincinelli's family. Notwithstanding Ms. Cincinelli's life long roots in the community, the fact that she has been a member of the New York Police Department for over a decade and is the mother of two young children, the Court ordered her detention based upon danger. We submit that the more detailed presentation made herein, along with the bail package proposed, should satisfy the Court that this is not the open and shut case posited by the government and that there are reasonable conditions that will ameliorate any concerns as to danger. The government does not

---

[2] Ms. Cincinelli was never married to Erik Groh, the father of her first child. Mr. Groh and Ms. Cincinelli have maintained a friendly relationship as co-parents to their ten-year old daughter. As to the order of protection in favor of the boyfriend, as will be set forth, *infra*, this was vacated weeks after it was issued.

assert that Ms. Cincinelli poses a flight risk.

On or about May 30, 2019, Ms. Cincinelli was indicted on two counts of Murder for Hire and one count of Obstruction of Justice (18 U.S.C. §§1958(a) and 3553 et seq; 18 U.S.C. §1512(e), 1512(c)(2) and 3553 et seq. The case has been assigned to this Honorable Court.

Since Ms. Cincinelli's arrest, many critical facts have emerged that significantly affect the purported strength of the government's case. These facts include information that forcefully rebuts the government's detention hearing assertions regarding Ms. Cincinelli's alleged volatility. They also include information regarding Dirubba that proves he is an inveterate liar who has admitted repeatedly in recent and sworn statements that he, on more than one occasion, has framed and falsely accused Valerie Cincinelli of crimes and other bad acts in Queens Criminal Court, in Queens Family Court, and with the Internal Affairs Bureau. It was, importantly, these false allegations by Dirubba that precipitated the discipline imposed on Ms. Cincinelli by the NYPD, and it was that discipline which the government in turn relied upon, in part, in support of its argument for detention. Finally, we have received and reviewed the tapes of the conversations which the government has cited as compelling evidence of guilt. We respectfully submit that they present powerful evidence of her innocence. Taken together, we are confident that this Court will regard these facts, set forth in detail below, as significant and sufficient to support the release on bond we seek herein.

While we readily acknowledge the seriousness of the charged offenses, we respectfully submit that, in comportment with the Constitution and the requirements of 18 U.S.C. § 3142, there are reasonable conditions of release sufficient to assure the Court of Ms. Cincinelli's appearance as directed and allay any concerns as to danger. Ms. Cincinelli is 35 years of age, a mother of two young children, a college graduate and a decorated 12-year veteran of the New York City Police Department. As a police officer she is in danger while incarcerated, and she is currently in need of continued medical care due to an injury she sustained after being attacked by a prisoner she was escorting in Brooklyn arraignments. She will abide by any and all conditions and restrictions the Court imposes. Her father, a 27-year veteran of the police department, has agreed to live with and watch over Ms. Cincinelli. Her brother, a law enforcement officer for 8 years, lives within minutes of her house and he, along with several other family members, will be present at her home on a daily basis.

We have secured a substantial bail package for the Court's consideration and respectfully

submit that when the facts herein are considered in a more informed and accurate context and in conjunction with the remaining statutory factors, Ms. Cincinelli emerges as a viable candidate for release on a significant bond with strict conditions. Contrary to the government assertions, Ms. Cincinelli does not pose a danger to the community nor is there any demonstrable risk that she will obstruct justice. Therefore, it is respectfully submitted that Ms. Cincinelli's detention is unwarranted under the facts and circumstances herein.

## THE LAW ON PRE-TRIAL DETENTION

Bail is enshrined in our constitutional history and tradition. In <u>Stack v Boyle</u>, 342 U.S. 1 (1951), the United States Supreme Court affirmed our long-standing societal interest in freedom from pretrial detention:

> From the passage of the Judiciary Act of 1789 to the present Federal Rules of Criminal Procedure, federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction. Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

As punishment by imprisonment comes only after conviction by proof beyond a reasonable doubt, pretrial detention is authorized in limited circumstances and only on an adequate showing that that the defendant poses a danger to the community or is likely to flee prior to trial. <u>United States v. Salerno</u>, 481 U.S. 739 (1987); <u>United States v Paulino</u>, 335 F. Supp. 3d 600 (2018). Under our Constitution, preventive detention "has been and should remain the exceptional practice." <u>United States v Scarpa</u>, 815 F. Supp. 88 (1993). As the Supreme Court stated in <u>United States v Montalvo-Murillo</u>, 495 U.S. 711 (1990):

> It is well to remember the magnitude of the injury that pretrial detention inflicts and the departure that it marks from ordinary forms of constitutional governance. Executive power to detain an individual is the hallmark of the totalitarian state. Under our Constitution the prohibition against excessive bail, the Due Process Clause of the Fifth Amendment, the presumption of innocence – indeed, the fundamental separation of powers among the

> Legislative, the Executive and the Judicial Branches of Government – all militate against the abhorrent practice. Our historical approach eschewing detention prior to trial reflect these concerns…

Liberty before a criminal trial is, and has always been the "norm" (United States v Paulino, *supra*, *citing*, United States v Salerno, *supra*, at 755).

The Bail Reform Act of 1984 included consideration of danger to the community as a relevant factor in bail determinations and authorized pretrial detention where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community" (United States v Paulino, 335 F. Supp. 3d 600 (2018); *citing*, United States v Chimurenga, 760 F.2d 400, 403 (2d Cir. 1985). This inclusion of danger to the community reflected the concerns for safety, however, with the "recognition that there is a *small but identifiable group of particularly dangerous individuals* as to whom neither the imposition of stringent release conditions nor the prospect of revocation of release can reasonably assure the safety of the community" (United States v Paulino, *supra*, at 608; [emphasis in original]; *quoting*, S. Rep. No. 98-225, at 6-7, *as reprinted in* 1984 U.S.C.C.A.N., at 3188-3189); see also, United States v Shakur, 817 f.2d 189, 195 (2d Cir. 1987)[The BRA itself requires that a court should "bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial]; United States v Salerno, 481 U.S. at 755 ["detention prior to trial or without trial is the carefully limited exception" to liberty before trial]. As Judge Andrew Carter made clear in Paulino, *supra*, these tenets must be scrupulously adhered to in order to sustain the presumption of innocence in the pre-trial stages:

> One charged with a crime is, after all, presumed innocent. *Stack,* 342 U.S. at 4, 72 S.Ct. 1. A single individual unnecessarily detained before trial is one individual too many, and the increasing use of the practice places tremendous wear on our constitutional system. *United States v. Montalvo-Murillo,* 495 U.S. 711, 723-24, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.). Due to the crucial interests involved, it follows that a "case-by-case" approach is required at any stage of the case in assessing the propriety of pretrial detention. *See United States v. Gonzales Claudio,* 806 F.2d 334, 340 (2d Cir. 1986) (citations omitted) (discussing due process analysis for evaluating propriety of prolonged pretrial detention, and the interests at stake), *cert. dismissed sub nom., Melendez-Carrion v. United States,* 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986).

*Paulino, supra,* at 609.

The Bail Reform Act requires the release of a defendant on the "least restrictive" conditions necessary to "reasonably assure . . . the safety of any other person and the community." 18 U.S.C. § 3142(b)(1)(c). The government must prove, by clear and convincing evidence, that the defendant poses a danger to the community or a risk of flight that "no conditions or combination of conditions" will alleviate. 18 U.S.C. § 3142(e) and (f). The government thus bears a "high burden" to justify detention. United States v Chimurenga, 760 F.2d 400 (2d Cir. 1985); See also, United States v Sabhnani, 493 F.3d 63 (2d Cir. 2007).

18 U.S.C. § 3142 (g) delineates the factors to be considered by a judicial officer in making a determination as to whether conditions exist that will reasonably assure the appearance of the accused as required and the safety of any other person and the community. These considerations are generally separated into two categories: the nature of the offense and the personal characteristics of the accused. The relevant factors include the nature and circumstances of the offense charged, including whether the offense is a crime of violence or it involves a narcotic drug, the weight of the evidence against the accused, the history of the accused, including her character, family ties, employment, financial resources, length of residence in the community and community ties, history relating to drug abuse, criminal history, and past record of appearing at court ordered appearances. With regard to whether a defendant poses a danger to the community, the court should consider "the nature and seriousness of the danger to any person or the community that would be posed by the person's release" (18 U.S.C. § 3142(g)(4)).

While safety is a concern for any court assessing cases involving violence, these concerns can be, and have been, addressed with pre-trial release conditions. In Chimurenga, *supra,* the Second Circuit affirmed the lower court's holding that the defendant did not pose a danger to the community notwithstanding the crimes of violence with which he was charged. The defendant was alleged to be the leader of a gang responsible for an armed robbery in Nanuet, New York which resulted in the death of an armored truck guard and two police officers. There was a wealth of evidence, including taped conversations concerning the murders and means of flight in the face of potential imprisonment. In Paulino, *supra,* Judge Carter wrote extensively on why he concluded that the defendant, an alleged gang member, should be released on a bond. The charges involved the beating and stabbing of a minor who was alleged to be a member of a rival gang. In Sabhnani, *supra,* the district court permitted the defendant released on bail, *after he was convicted* of crimes

11

of violence, in order to put his affairs in order in preparation for sentence.

In <u>United States v Jamel McTier</u>, 17-cr-557 (FB), Judge DeArcy Hall, sitting as a miscellaneous district court judge, conducted hearings on the government's appeal from a magistrate's decision to grant bail. The government's argument as to danger was grounded in the defendant's prior attempted murder conviction, prior domestic violence and alleged gang affiliation. After due deliberation, Judge Hall released the defendant on home detention with strict conditions.

These cases make clear that the existence of safety concerns with respect to an individual defendant does not, *a fortiari*, justify detention. It is respectfully submitted that after consideration of the above factors, this Court should conclude that there are indeed appropriate and sufficient conditions of release which should be granted to Valerie Cincinelli. A district court reviews a bail determination *de novo* (<u>United States v Paulino</u>, *supra*). We ask that Your Honor do so in this case and grant Ms. Cincinelli pre-trial release on the strict conditions imposed below.

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND POTENTIAL PUNISHMENT

The crimes with which Ms. Cincinelli has been accused are indeed serious and involve allegations of violence. The government has asserted that in February, 2019, Ms. Cincinelli approached a confidential source, her ex-boyfriend John Dirubba, and asked him to find someone to kill her estranged husband and Dirubba's daughter. It is further alleged that Ms. Cincinelli withdrew $7,000.00 from a bank account in February, 2019 and that Dirubba, *on the same day*, converted the funds to gold coins worth $6,935.00 to pay the "hitman" he apparently found in short order. Three months later Dirubba went to the FBI to report this crime and began recording "some" of the conversations with Ms. Cincinelli and facilitating her eventual arrest. We recognize that portions of the recordings are troubling. However, other portions make it palpably clear that Ms. Cincinelli never actually believed that Dirubba would carry out his plan to commit these murders and that she most certainly did not pay him to do so. As such, these tapes are as exculpatory for the defense as the government contends they are incriminating for its prosecution. Moreover, the facts and events preceding the May, 2019 tapes are an integral part of this story as they demonstrate

the dubious credibility of the equally central figure in this case, John Dirubba.[3] Clearly, there is more to this case than the conversations recorded by Dirubba in the week preceding Ms. Cincinelli's arrest.

The government's case in large part rests upon the assertions and credibility of John Dirubba. Dirubba's past history, including his past admittedly false accusations against Ms. Cincinelli, go far to demonstrate both his lack of credibility and his propensity to falsely accuse Ms. Cincinelli of serious offenses. These false accusations – always lodged after Ms. Cincinelli broke up with Dirubba - were designed as a cudgel to force her to accept him back into her life. His posture was simple – "break up with me and I will ruin you".

Ms. Cincinelli met John Dirubba sometime in 2017 as her relationship with her then husband, Isaiah Carvalho, was deteriorating. Within months, Dirubba revealed himself to be a manipulative and extremely possessive individual. When Ms. Cincinelli attended her brother's wedding in Virginia - to which Dirubba was not invited - he insisted on driving her there and waiting for her. He stalked her by waiting by her highway exit and then following her, and otherwise monitoring her whereabouts. He constantly called and texted her to find out where she was. Dirubba was also a financial drain on her, and as related by many to the undersigned, a thief. He used her credit card without her permission on many occasions, and repeatedly borrowed money from her. On two occasions, he borrowed money to buy gold coins that he later claimed to have resold at a profit.[4] He also stole Ms. Cincinelli's jewelry and denied it when she confronted him about it. Later, he admitted the theft and returned the purloined jewelry sporadically over the course of eight months.

For these reasons and more, Ms. Cincinelli repeatedly broke off the relationship with Dirubba. What followed was a veritable onslaught by Dirubba of false accusations against her to various authorities, all of which were designed to threaten her career as a decorated police officer and to otherwise disrupt her life. Invariably, after each incident, Dirubba implored Ms. Cincinelli to reconcile with him by promising to reimburse her and to discontinue his problematic behavior. Predictably, he never kept that promise and instead resumed his dysfunctional behavior.

---

[3] There are no tape-recorded conversations supporting Dirubba's claims prior to May, 2019.
[4] On the first occasion, Dirubba used Ms. Cincinelli's credit card without her permission to buy gold and on the second occasion he borrowed the money to buy coins. These purchases pre-dated the purchase of coins he made in February, 2019.

The barrage of complaints and accusations were staggering in their admitted falsity and consequent disruption to Ms. Cincinelli's life and career.  His first complaint to IAB was in November, 2017 when he accused Ms. Cincinelli of wrongdoing after a disagreement. As a result of this allegation, Ms. Cincinelli was placed on modified duty and transferred. Over the next several months, Dirubba called her incessantly to reconcile. After she refused his overtures and changed her phone number several times, he retaliated by filing a Petition and a request for an Order of Protection in Queens County Family Court on February 13, 2018 alleging that Ms. Cincinelli threatened him with her gun. He then filed a complaint with the police and had Ms. Cincinelli arrested on March 5, 2018 in Queens County for Criminal Contempt and Aggravated Harassment. This precipitated yet another IAB investigation resulting in the discipline referred to by the government during the initial bail application in this case. Ms. Cincinelli was re-assigned to arraignments in Kings County where she was brutally attacked by a prisoner who assaulted her and attempted to rape her.[5] At some point Dirubba even accused her of child abuse. However, as demonstrated below, these were all false allegations and Dirubba admitted as much, in sworn statements and direct (taped) interviews, to all of the agencies to which he complained.

On April 13, 2018, only two months after filing the allegations of contempt and harassment in the Queens criminal matter, Dirubba withdrew them and the charges were dismissed. (See, Certificate of Disposition, attached hereto as **Exhibit D**). We have ordered the transcripts to this proceeding but have not received them as of this writing as the matter was dismissed and sealed. However, individuals in attendance at the proceeding have informed the undersigned that before the matter was dismissed Dirubba withdrew the complaint on the record stating that he "made it up". Moreover, in a taped telephone interview with Investigator Sgt. Behrman from IAB relating to the Queens case and the IAB charges, Dirubba admitted that Ms. Cincinelli "didn't do nothing wrong at all", that he "signed a letter with the DA", admitting "that I made it up" and that "everything was not true".[6] Dirubba made it clear that he was admitting these lies "on his own". He also referred to a sworn and notarized letter that he had submitted to IAB and to a similar letter that he had submitted to the Queens District Attorney's Office admitting the falsity of his allegations. He further admitted that the complaint he made to IAB was equally false. He

---

[5] Ms. Cincinelli sustained a rotator cuff injury during the struggle for which surgery was required. The attacker is being prosecuted by the Kings County District Attorney's office.
[6] We have reviewed the IAB tapes and will provide them to the Court upon request. The government has informed the undersigned that they too have reviewed these recordings.

repeatedly stated that he had been attempting to communicate the utter falsity of his allegations and that the matter should be dropped.

That Dirubba's remaining allegations were contrived is well documented. On March 15, 2018, just one month after he made his allegations in Family Court upon which the Queens criminal case was predicated, the order of protection and the petition he obtained were vacated. (See, Order of Dismissal, attached hereto as **Exhibit E**). In the end, there was only one legitimate order of protection during this period and it was filed on March 8, 2018 *in favor* of Ms. Cincinelli and against Mr. Dirubba. (See, Order of Protection in favor of Valerie Cincinelli, attached hereto as **Exhibit F**). As to the child abuse allegations Dirubba reported, Social Services investigated the matter and concluded that the allegations were unfounded. Dirubba did not contest that finding (See, Unfounded Child Abuse Complaint, attached hereto as **Exhibit G**).

These facts, and Dirubba's admissions that he repeatedly framed Ms. Cincinelli, are important for two reasons. First, to the extent that the magistrate relied upon statements by the government implying a prior violent propensity by Ms. Cincinelli, it is clear that Ms. Cincinelli has been a victim of abuse and not a purveyor of it. Moreover, the discipline imposed by the NYPD and relied upon by the government in their presentation to the magistrate was, in large part, the result of Dirubba's admittedly false allegations. Most importantly, these facts demonstrate that Dirubba has manipulated facts and perjured himself on several occasions in his self-described quest to "ruin" Ms. Cincinelli's career and life when she would no longer put up with his lying and stealing from her. This, we submit, is exactly what happened in the present case. The timing and circumstances of the present case are strikingly consistent with this past pattern of false allegations.

Sometime before April 28, 2019, Ms. Cincinelli again broke up with Dirubba and kicked him out of her house. On or about April 28, 2019, less than a week before Dirubba went to the FBI, he texted Ms. Cincinelli complaining that he had nowhere to go and that he would pay her $200.00 a night to sleep on her couch until he got his money back from his bookie. Days later Dirubba, texted her:

> I wish I had the money right now to come over and give to you that
> I really do but I don't and I have to suffer for it for the poor decisions
> that I made please don't judge me…I really wish I had the money in
> my pocket to come to you but I don't…

(Attached hereto as **Exhibit H**, is the screenshot of Dirubba's text). We have subpoenaed telephone records for this account, however Boost Mobile does not retain the content of text messages. They are, however, preserved on the cellphone seized by the government).

Following this text, Ms. Cincinelli allowed Dirubba to come back into the house. Sometime in early May, 2019 she gave Dirubba an ultimatum to either pay her the $15,600.00 he owed her or leave her home. On May 2, 2019 Dirubba texted Ms. Cincinelli setting forth how he would pay her back (See, screenshot of May 2, 2019 text attached hereto as **Exhibit I**). The two even created a schedule of payments which was preserved in Ms. Cincinelli's phone. Dirubba failed to abide by the agreement and Ms. Cincinelli told him to leave. In a manner strikingly similar to his past pattern of false allegations, within days Dirubba went to law enforcement with the current allegations. He then weaseled his way back into the house and began eliciting the statements made on the tapes. It is these statements which the government maintains provide compelling proof of these charges. We respectfully disagree.

Many of Ms. Cincinelli's statements are troublesome and yet, two critical facts emerge from these tapes. These tapes clearly demonstrate that Ms. Cincinelli did not pay Dirubba to kill anyone and that she never believed that he would follow through on his supposed plans to hire a hitman. During these taped conversations, orchestrated by law enforcement and designed to elicit the elements of the murder for hire statute (18 U.S.C. §1958), Dirubba mentions money several times. Indeed, he has to in order to provide the evidence sought by the government. But, never once did Ms. Cincinelli refer to paying Dirubba, even when the context would have demanded it. Indeed, rather than responding to his mention of money with the claim that she already paid him, she merely mocks him with his own words: that he had a friend who "owes you a favor" and "he owed you a favor and you don't have to pay him anything". Section 1958 requires that something of "pecuniary value" be paid for a murder for hire plot to be established. The Second Circuit has spoken directly to what is required for this element (United States v Frampton, 383 F.3d 213, 218-2019(2d Cir. 2004)[holding that "a favor" was insufficient to satisfy the pecuniary value element of §1958]; See also, United States v Davis, 14 Cr. 296 (Forrest, K. United States District Court Judge 2015)[granting a rule 29 motion dismissing the Murder for Hire charge holding that a vague promise of something in the future was insufficient to satisfy the pecuniary value element]. These statements debunk any notion that she agreed to, or ever paid Dirubba to, commit murder.

Moreover, Dirubba's claims that Ms. Cincinelli paid him $7,000.00 to commit two murders defy common sense. He claims the February, 2019 withdrawal of $7,000.00 by Ms. Cincinelli was for a hitman, and yet he took the money and bought gold coins worth less than $7,000.00 What hit man not only wants payment in gold coins, but in an amount that is less than he is charging? In actuality, the explanation for Dirubba's purchase of gold coins is in his past, for it can be no coincidence that on two prior occasions Dirubba borrowed or took the same amount of money from Ms. Cincinelli - $7,000.00 – in order to buy gold coins because he fancied himself knowledgeable in the price fluctuations of gold.[7] Ms. Cincinelli did not pay Dirubba to hire a hit man.

Moreover, these tapes make it abundantly clear that Ms. Cincinelli never intended for Dirubba or any hitman to commit murder.  Ms. Cincinelli's reaction to Dirubba after the police appeared at her house with the news that her husband has been killed makes it clear that she never believed he would commit these murders. While Ms. Cincinelli is sobbing after hearing the news that her husband is dead, Dirubba, clearly searching for words to elicit incriminating statements, says: "[y]ou knew this was going to happen". Ms. Cincinelli, weeping uncontrollably, responded, "I didn't believe you. I never believe you. You … lie about everything". Dirubba continues fishing for more and again Ms. Cincinelli responds "I really, I like really, really can't believe this. Like, I thought you were full of shit. You're always full of shit. You f…..g lie about everything….You f…….g lie about everything since the day I f…….g met you". These words were not spoken for the benefit of the voice recorder in order to establish a defense – Ms. Cincinelli did not know she was being recorded.  These words reflect her sincere reaction to the news of her husband's death, and were expressed during what she thought was a private conversation with Dirubba. Manifestly, these words and emotions are not those of a woman who was involved in a conspiracy to commit murder. During this private moment with her supposed conspirator, the government no doubt expected to get verification of the murder plot, perhaps to even capture evidence of some glee that it was actually accomplished. Instead, what they got was proof of her utter disbelief and devastation at what she believed Dirubba had done. This was her chance to seal the fate the government asserts should befall her now. Instead her response was the truth. She never intended or believed he would do this.

---

[7] We are aware of the gold dealer he bought the gold from and are awaiting bank records which will reflect the withdrawals.

Dirubba currently has a pending felony case in New York County in which he has been charged with Robbery in the Third Degree and Grand Larceny (See, New York State Unified Court System WebCrims Summary, attached hereto as **Exhibit J**). In that case Dirubba is accused of stealing a $54,000.00 diamond ring from a man he agreed to purchase the ring from. Instead of paying for the ring, he is accused of telling his victim "that he had a gun with him", that the victim "best leave" his vehicle or be shot and that he was "connected with Gotti people". Interestingly, this arrest occurred in January, 2019, just one month before he took $7,000.00 from Ms. Cincinelli to buy gold coins, not for any hitman but for himself. While Dirubba dramatically expressed his anguish over the Cincinelli matter to the press on May 21, 2019, just after a court appearance, his neighbors were simultaneously describing him as "a con man" who had amassed over $20,000.00 in unpaid rent. His former landlord told an interviewer that he asked Dirubba at one point "Why are you doing this?" The landlord then opined to the interviewer, "He'd tell 10 lies to cover one" (See, New York Daily News Article, attached hereto as **Exhibit K**). Indeed he is an admitted liar. He has sworn to being a liar and perjurer and he has lied, by his own admission, to destroy Valerie Cincinelli.

In sum, these facts and documentary corroboration cast significant doubt on the credibility of the man who the jury would need to believe in order to convict Ms. Cincinelli of the crimes charged. While the government will assert that the recordings provide all the proof necessary to sustain their burden, they do not. There is undoubtedly much context, and many conversations that Dirubba chose not to record, that the jury will need to consider. The tapes offer substantial proof that Ms. Cincinelli never paid Dirubba to commit murders, never believed the murders were going to be committed, and therefore never intended them to be committed. These are critical facts relevant to necessary elements of the crime charged, and they directly affect the strength of the government's case. For purposes of this application they certainly affect the analysis of whether Ms. Cincinelli poses a danger to the community or the purported victims in this case.

The government's assertion that Ms. Cincinelli is a danger to the community was based in part on the allegations that Dirubba filed and later recanted, a fact that was not addressed by the government nor considered by the Court during the bail hearing. The government further asserts that Ms. Cincinelli poses a danger to the intended victims because she "hatched" this plan in her home. We respectfully disagree. Most individuals charged with crimes commit them and certainly discuss them in their homes. They are often released and confined to their homes. The notion that

releasing Ms. Cincinelli to her home, with her father, on a substantial bond with the restrictions proposed would somehow elevate the non-existent danger to the community is without merit. The question is not where Ms. Cincinelli can be released to. The question is whether she poses a danger to anyone. The government cannot be suggesting that if released to her home Ms. Cincinelli will seek out another Dirubba and hire this person to harm these or any other individuals. She will be confined to her home without any means of communication other than to communicate with counsel and her physician.

This is not, as the government contends, an open and shut case for which bail should not be granted. Indeed, there are significant factual and legal issues that will be litigated in the months to come. When considered along with the history and background of Ms. Cincinelli, pre-trial release is warranted.

## HISTORY AND BACKGROUND, EMPLOYMENT, AND COMMUNITY TIES OF VALERIE CINCINELLI

While the evidence and nature of the offense are relevant in a detention determination, the history and background of Valerie Cincinelli are equally important. This is not, we respectfully submit, an individual for whom detention is appropriate.

Valerie Cincinelli is 35 years of age and was raised in Long Beach, New York until she was in the 9th grade. She has three brothers - Sal, Louie and Nick, ages 41, 32, and 26. Her oldest brother has been a law enforcement officer  for approximately 8 years and her two other brothers are gainfully employed, one as a business owner and the other an account executive at Indeed.com. Ms. Cincinelli's father, Louis Cincinelli, was a decorated police officer with the NYPD for 27 years before he retired.[8] After he retired, Ms. Cincinelli moved to Virginia with her father and finished high school. She then attended Longwood University where she majored in criminology and political science. In high school Ms. Cincinelli was in the JR marine ROTC and in college she served in the army ROTC. After her graduation, Ms. Cincinelli returned to New York where she fulfilled her life-long dream of becoming a police officer, joining the NYPD in 2007.

For the past twelve years, Ms. Cincinelli has served the public honorably as a New York City police officer. She has undergone high intensity drug trafficking enforcement training and has

---

[8] Louis Cincinelli is also a veteran of the Vietnam war and was in the army reserves for twenty years.

received awards from the police department for her excellent service (See, Training Certificates and Service Awards, attached hereto collectively as **Exhibit L**). She has never been cited for excessive force of any kind. In addition to her service on the police force, Ms. Cincinelli joined the New York Guard, a military contingent that assists the National Guard when called into service in New York. This commitment is on a volunteer basis. In 2016, Ms. Cincinelli was awarded the Soldier of the Year Award (See, Soldier of the Year Award, attached hereto as **Exhibit M**).

Ms. Cincinelli is the mother of two children, ages ten and five. Her oldest child was the result of a relationship with Erik Groh with whom the undersigned has spoken. Mr. Groh has related that while their romantic relationship ended years ago, they have remained close friends and have co-parented their daughter in a positive and productive way. Mr. Groh relates that Ms. Cincinelli is a devoted, doting and loving mother to their daughter and he fully supports her in this ordeal. Mr. Groh witnessed, as so many others close to Ms. Cincinelli have, the possessive, erratic, manipulative and dysfunctional nature of Mr. Dirubba. While Mr. Groh has taken custody of their daughter, he fully expects that Ms. Cincinelli will be exonerated and that he will return their daughter to her custody.

Ms. Cincinelli's five-year old son is the product of her marriage to Isaiah Carvalho, one of the alleged victims in this case. This was a troubled relationship marred by Carvalho's violence against Ms. Cincinelli. Ms. Cincinelli filed several domestic incident reports (See, Domestic Incident Reports, attached hereto as **Exhibit N**) and Orders of Protection were issued against Mr. Carvalho on June 12, 2016, July 28, 2016 and August 7, 2017 (See, Orders of Protection, attached hereto as **Exhibit O**). Mr. Carvalho was arrested in Nassau County for one of these incidents and pled guilty to creating a Hazardous or Physically Offensive Condition. He was sentenced to a conditional discharge (See, Office of the District Attorney Nassau County Letter, attached hereto as **Exhibit P**). On August 24, 2016 after an evaluation by the Long Island Council on Alcoholism and Drug Dependence, Mr. Carvalho was recommended for an 8-hour anger management class (See, Anger Management Referral, attached hereto as **Exhibit Q**).

Notwithstanding these incidents, Mr. Carvalho and Ms. Cincinelli have raised their child pursuant to a custody order issued on January 23, 2018 in which Ms. Cincinelli was awarded residential custody of the child with delineated visitation for Mr. Carvalho (See, Order of Custody and Parenting Time, attached hereto as **Exhibit R**). As for the pending divorce proceedings, Ms. Cincinelli and Mr. Carvalho arrived at a settlement agreement in January, 2019 that the parties

were comfortable with. Ms. Cincinelli did not contest Mr. Carvalho's access to their child, and indeed afforded him as much visitation as he desired in order to ensure the father's presence in the child's life.

Contrary to the assertions made by the government in the initial bail hearing, Ms. Cincinelli has not had orders of protection issued against her except for the one unfounded, and vacated order precipitated by Dirubba's admittedly false allegations. She has been the victim of domestic violence and aside from the allegations Dirubba has sworn to be false, she has never been accused of violent behavior towards anyone. For twelve years she served as a police officer discharging her duties appropriately and without the use of unnecessary force. Thus, the government's reliance on a propensity of violence is not supported by the facts.

In addition to the above, we ask the Court to consider Ms. Cincinelli's current health and conditions of confinement. As a result of the IAB complaint, Ms. Cincinelli was placed on modified duty and assigned to arraignments in King's County. On or about September 14, 2018 a prisoner Ms. Cincinelli was transporting brutally attacked her during an attempted rape, causing a rotator cuff and head injury.[9] Ms. Cincinelli was initially taken to NYU Langone Medical Center and later treated at the Orlin and Cohen Orthopedic Group in Garden City, New York by Dr. Mait. She was immobile for six weeks during which she underwent rotator cuff surgery. She was scheduled to begin physical therapy on her shoulder. We have subpoenaed her medical records and will provide them upon receipt. Her assailant is being prosecuted by the King's County District Attorney's Office by Assistant District Attorney Connie Salomayo who has confirmed that Ms. Cincinelli was initially treated at NYU Langone after the incident.[10] Ms. Cincinelli is in pain at the Metropolitan Detention Center in Brooklyn and despite the docket entry directing medical attention at the initial arraignment, she has yet to be seen by a physician. Upon her hopeful release, Ms. Cincinelli would continue her treatment.

Finally, we ask Your Honor to consider the onerous conditions of Ms. Cincinelli's confinement. When she was initially detained, Ms. Cincinelli was confined to the Special Housing Unit (SHU) at the Metropolitan Detention Center [MDC] in Brooklyn. The conditions at MDC in

---

[9] https://nypost.com/2018/09/14/inmate-tries-to-rape-nypd-officer-in-court/

[10] People v Jeriah Bamugo, 06930-2018. Bamugo has been charged with Assault in the Second Degree (2 counts), Attempted Sexual Abuse in the Third Degree, Assault on a Police Officer and Sexual Assault on a Police Officer among other charges.

general, but in particular in the SHU, have been well documented. She was confined to a cell for 24 hours, without medical attention or access to email to communicate with her family. She was permitted one 15-minute phone call per week, which she did not receive in her first two weeks there. Access to counsel and computers is limited as it takes at least one hour for counsel to be admitted to the SHU and for Ms. Cincinelli to be brought to the visiting area - where the temperature varies from bad to worse for reasons, it seems, no one will ever fully understand. After two weeks in the SHU, Ms. Cincinelli was transferred to general population. While these conditions are better in terms of contact with her family and counsel, she is a police officer in a population of dangerous and violent individuals who count police officers as their chief rivals in life. A repeat attack is a distinct possibility. Thus, she is left with the option of requesting the SHU for her safety – and sacrificing communication with counsel and family -  or enduring the constant possibility of an attack.

In sum, we respectfully submit that Ms. Cincinelli's personal history and community ties and the additional circumstances detailed above warrant the granting of pre-trial release in this case. We submit the following bail package for the Court's consideration.

We propose a bond in the amount of $1,500,000.00 secured by four properties and co-signed by the several suretors listed below - all close family members and friends. This would be a fully collateralized bond.  The terms of this release will be as strict as this court deems necessary – including home detention and any other geographic restrictions on travel supported by electronic monitoring, as well as the surrender of any and all travel documents. Ms. Cincinelli would also abide by any order that she not possess or use a cell phone for any reason. Ms. Cincinelli's father has agreed to live with her at her residence. The only telephone on the premises would be the landline necessary for the implementation of the electronic monitoring. We ask only that Ms. Cincinelli be permitted to attend to her medical needs and meetings with counsel, with notification to pre-trial, and with the government and the Court's approval. During any necessary medical travel an individual approved by the appropriate parties would travel with her. To follow is a list of the properties to be posted to secure the requested bond along with the proposed suretors.[11]

Property 1:   ████████████████████████

---

[11] We have redacted the personal information of the suretors to ensure their privacy and to avoid harassment. We will provide unredacted copies to the Court and government under separate cover.

Value: $500,000.00

Debt:   Approximately $300,000.00

Equity: Approximately $200,000.00

Owner: Valerie Cincinelli

(Attached hereto as **Exhibit S** are Ms. Cincinelli's documents associated with her property).

Property 2:   ████████████████████████

Value: $800,000.00

Debt: Approximately $467,000.00

Equity: Approximately $333,000.00

Owners: Sal and Danielle Cincinelli

Relationship to Ms. Cincinelli: Brother and sister-in-law

(Attached hereto as **Exhibit T** are Mr. and Mrs. Cincinelli's documents associated with their property).

Property 3:   ████████████████████████

Value: $700,000.00

Debt: Approximately $493,000.00

Equity: Approximately $207,000.00

Owners: James and Patricia Baxter

Relationship to Ms. Cincinelli: Uncle and Aunt

(Attached hereto as **Exhibit U** are Mr. and Mrs. Baxter's documents associated with their property).

Property 4:   ████████████████████████

Value: $550,000.00

Debt: Approximately $248,000.00

Equity: Approximately $302,000.00

Owners: Michael and Deborah Kosta

Relationship to Ms. Cincinelli: Longstanding Family Friends

(Attached hereto as **Exhibit V** are Mr. and Mrs. Kosta's documents associated with their property).

<u>Suretor</u>: Sal Cincinelli (Ms. Cincinelli's brother)
- Date of Birth: ████████
- Social Security Number: ████████
- Employment: Law Enforcement Officer
- Salary: $150,000.00

(Attached hereto as **Exhibit W** is a copy of Mr. Cincinelli's identifying documents and 2018 Tax Return).

<u>Suretor:</u> Danielle Cincinelli (Ms. Cincinelli's sister-in-law)
- Date of Birth: ████████
- Social Security Number: ████████
- Employment: Nurse Practitioner – St. Francis Hospital
- Salary: $100,000.00

(Attached hereto as **Exhibit X** is a copy of Mrs. Cincinelli's identifying documents and 2018 Tax Return).

<u>Suretor:</u> Louis B. Cincinelli (Ms. Cincinelli's father)
- Date of Birth: ████████
- Social Security Number: ████████
- Employment: Retired NYPD / U.S. Army Officer
- Pension: $120,000.00

(Attached hereto as **Exhibit Y** is a copy of Mr. Cincinelli's identifying documents)
.

Suretor: Louis M. Cincinelli (Ms. Cincinelli's brother)
- Date of Birth: ▉▉▉▉▉▉
- Social Security Number: ▉▉▉▉▉▉
- Employment: Self-employed Online Entrepreneur
- Salary: $52,000.00

 (Attached hereto as **Exhibit Z** is a copy of Mr. Cincinelli's identifying documents and 2018 Tax Return).

Suretor: Nicholas Cincinelli (Ms. Cincinelli's brother)
- Date of Birth: ▉▉▉▉▉▉
- Social Security Number: ▉▉▉▉▉▉
- Employment: Account Executive – Indeed.Com
- Salary: $110,000.00

(Attached hereto as **Exhibit AA** is a copy of Mr. Cincinelli's identifying documents and 2018 Tax Return).

Suretor: Richard Sautner (Longstanding Family Friend)
- Date of Birth: ▉▉▉▉▉▉
- Social Security Number: ▉▉▉▉▉▉
- Employment: FDNY Lieutenant
- Salary: $135,000.00

(Attached hereto as **Exhibit BB** is a copy of Mr. Sautner's identifying documents and 2018 Tax Return).

Suretor: Michael Kosta (Longstanding Family Friend)
- Date of Birth: ▉▉▉▉▉▉
- Social Security Number: ▉▉▉▉▉▉
- Employment: Manager at Kamco Supply Co.

- Salary: $200,000.00

(Attached hereto as **Exhibit CC** is a copy of Mr. Kosta's identifying documents and 2018 Tax Return).

Suretor: Patricia Baxter (Ms. Cincinelli's aunt)
- Date of Birth: ███████
- Social Security Number: ███████
- Employment: Administrator/Bookkeeper for Long Beach School District
- Salary: $81,000.00

(Attached hereto as **Exhibit DD** is a copy of Mrs. Baxter's identifying documents and 2018 Tax Return).

The suretors in this case are Ms. Cincinelli's closest family members – her father, brothers, sister-in-law and longstanding family friends. The total equity in the houses being posted is $1,042,000.00 and the salaries of the suretors combined is $948,000.00. All of these individuals are placing their future financial stability on the line with this bond, yet they do so with an abiding faith that their daughter, sister and friend would never leave them destitute. With their dependents, there are at least 24 men, women and children who will be affected by the consequent indebtedness to the government and the ensuing financial ruin that would follow if Ms. Cincinelli were to flee or violate any conditions of her bond. They know her best, and each of them has expressed their unequivocal certainty that Ms. Cincinelli would never put their financial lives and well-being at risk. They are confident that both her character and her love and commitment for her family and friends combine to make the possibility of her flight from this Court's jurisdiction non- existent. She will not flee or violate any conditions of release imposed by this Honorable Court.

**CONCLUSION**

Based upon the foregoing, it is respectfully submitted that there exist reasonable conditions of release sufficient to assure Ms. Cincinelli's compliance with a bond. As such, it is respectfully requested that the Court grant Ms. Cincinelli's pre-trial release in this matter.


Dated:          June 13, 2019
                New York, New York


                                        Respectfully Submitted,


                                        _____/s/_____

                                        JAMES KOUSOUROS
                                        Law Offices of James Kousouros
                                        260 Madison Avenue, 22nd Floor
                                        New York, NY 10016
                                        Tel: (212) 532-1934
                                        Fax: (212) 532-1939
                                        James@kousouroslaw.com


cc:     Hon. Sandra J. Feuerstein

        Catherine Mary Mirabile,
        Lara Gatz,
        *Assistant United States Attorneys*

        Valerie Cincinelli