**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------------------
**UNITED STATES OF AMERICA,**


**-against-**


**VALERIE CINCINELLI,**

                                                *Defendant*.


**SENTENCING MEMORANDUM**


**19 CR 245 (JS)**
-------------------------------------------------------------------------------------------


By:  James Kousouros, Esq.
*Attorney for Ms. Cincinelli*
Law Offices of James Kousouros
260 Madison Avenue, 22nd floor
New York, New York 10016
Tel: (212) 532-1934
Fax: (212) 532-1939
James@kousouroslaw.com

## <u>TABLE OF CONTENTS</u>

Preliminary Statement ................................................................................................................ 1

A.  The Plea Agreement and Presentence Report .................................................................. 2

    Applicable Law ............................................................................................................... 3

B.  Summary of Argument .................................................................................................... 5

C.  Personal History, Characteristics and Family Circumstances of Valerie P. Cincinelli ...... 9

    "Before" ........................................................................................................................... 9

    "During" ......................................................................................................................... 20

    "After" ............................................................................................................................ 33

D.  The Conditions of Confinement at the MDC in General and Those Implemented in the
    Wake of and During The COVID-19 Pandemic .............................................................. 37

E.  Remaining Factors of 18 U.S.C. §3553(a) ...................................................................... 42

    Sentencing Disparities .................................................................................................... 42

    General and Specific Deterrence ..................................................................................... 44

    Need to Protect the Public ............................................................................................... 46

Conclusion .............................................................................................................................. 48

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................................. 3

*Pepper v. United States*, 131 S. Ct. 1229 (2011) ................................................... 4, 5

*United States v. Booker*, 543 U.S. 2020 (2005) ........................................................ 3

*United States v. Carty*, 264 F.3d 191 (2d Cir. 2001) ................................................ 37

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ............................................... 3

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) .............................................. 3, 4

*United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020) .................. 37

*United States v. McRae*, 17 Cr. 643 (PAE)(S.D.N.Y. January 15, 2021) ...................................... 37

*United States v. Nkanga*, 18 Cr. 713 (JMF), 2020 WL 1529535 (S.D.N.Y. March 31, 2020) ..... 37

*United States v. Rodriguez*, 00 Cr. 761-12 (JSR), 2020 WL 5810161 (S.D.N.Y. September 30 2020) ................................................................................................ 37

*United States v. Vonner*, 516 F.3d 382 (6th Cir. 2008) ................................................. 3

**Statutes**

18 U.S.C. § 1512 ...................................................................................................... 1

18 U.S.C. § 1958 ...................................................................................................... 1

18 U.S.C. § 3553(a) .............................................................................................. 4, 39

18 U.S.C. § 3661 ...................................................................................................... 3

**Regulations**

U.S.S.G. § 2J1.2(c)(1) .............................................................................................. 2

U.S.S.G. § 2X3.1 ...................................................................................................... 2

**LIST OF EXHIBITS**

**Exhibit A:**    Plea Agreement

**Exhibit B:**    Letter to the Court from Danielle Cincinelli

**Exhibit C:**    Letter to the Court from ████████████

**Exhibit D:**    Letter to the Court from ████████████

**Exhibit E:**    Letter to the Court from Valerie P. Cincinelli

**Exhibit F:**    Letter to the Court from Louis Cincinelli, Sr.

**Exhibit G:**    Letter to the Court from Louis Cincinelli, Jr.

**Exhibit H:**    NYPD Certificates awarded to Valerie P. Cincinelli

**Exhibit I:**    Daily News Article

**Exhibit J:**    Solider of the Year Award awarded to Valerie P. Cincinelli

**Exhibit K:**    Letter to the Court from Steven Milito

**Exhibit L:**    Letter to the Court from Jacinta Femenias

**Exhibit M:**    Letter to the Court from Debbie Kosta

**Exhibit N:**    Letter to the Court from Nick Cincinelli

**Exhibit O:**    Letter to the Court from Melissa Hackworth

**Exhibit P:**    Letter to the Court from ████████████

**Exhibit Q:**    Letter from Rosemarie Cincinelli-Stevens

**Exhibit R:**    Additional Letters in Support of Valerie P. Cincinelli

**Exhibit S:**    Letter to the Court from Erik Groh

**Exhibit T:**    Text Messages between Valerie Cincinelli and John Dirubba

**Exhibit U:**    FBI, Internet Crime Complaint

**Exhibit V:**    ████████████████████

**Exhibit W:**    ████████████████

iv

**Exhibit X:** ██████████████

**Exhibit Y:** █████████████████████████████

**Exhibit Z:** ████████████████████████████████████

**Exhibit AA:** ████████████

**Exhibit BB:** █████████████████████████████████████

**Exhibit CC:** ███████████████████████████

**Exhibit DD:** ███████████████████████████

**Exhibit EE:** ███████████████████████████

**Exhibit FF:** ███████████████████████████

**Exhibit GG:** █████████████████████████

**Exhibit HH:** █████████████████

**Exhibit II:** █████████████

**Exhibit JJ:** MDC Brooklyn Education Department Certificates Awarded to Valerie P. Cincinelli

**Exhibit KK:** BOP Inmate Work Performance Ratings

**Exhibit LL:** Inmate Letters in Support of Valerie P. Cincinelli

**Exhibit MM:** Letter from Rev. Ngozi Osuji

**Exhibit NN:** Bureau of Prisons, Health Services, Encounter Report

**Exhibit OO:** Report and Curriculum Vitae of Mark J. Mills, JD, MD

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**------------------------------------------------------**
**UNITED STATES OF AMERICA,**

                     **-v-**                                    **19-CR-245 (JS)**


**VALERIE CINCINELLI,**

                     **Defendant.**
**------------------------------------------------------**

## SENTENCING MEMORANDUM

### *Preliminary Statement*

This memorandum is respectfully submitted on behalf of Valerie Patricia Cincinelli who

is scheduled to be sentenced by the Honorable Joanna Seybert, United States District Court Judge

for the Eastern District of New York, on October 29, 2021. On May 17, 2019 a sealed Complaint

was filed in the Eastern District of New York charging Ms. Cincinelli with two counts of Murder

for Hire. *See* 18 U.S.C. § 1958. On May 29, 2019 an Indictment was filed charging Ms. Cincinelli

with two counts of Murder for Hire and one count of Obstruction of Justice. *See* 18 U.S.C. § 1512.

On July 16, 2020 a superseding Indictment was filed charging the same violations but expanding

the temporal scope in Count One.

After extensive investigation and review of the evidence by both the Government and the

defense over the ensuing 23 months, on April 16, 2021, Ms. Cincinelli pled guilty before Your

Honor to Count 3 of the superseding Indictment, to wit, Obstruction of Justice, which charged that

Ms. Cincinelli obstructed a grand jury investigation which was reasonably foreseeable to her.

1

Subsequent to the entry of her guilty plea, Ms. Cincinelli was interviewed by United States Probation Officer Gregory Giblin, and a Presentence Report was submitted to the Court and counsel.

Ms. Cincinelli has remained in custody for almost 30 months since May 17, 2019.

### A. *The Plea Agreement and Presentence Report*

Ms. Cincinelli entered her plea of guilty pursuant to a Plea Agreement with the Government on April 16, 2021. *See* Exhibit A, Plea Agreement. She pled guilty to Count 3 of the superseding Indictment, to wit, Obstruction of Justice. Ms. Cincinelli admitted that she deleted materials from her cell phone and instructed another to delete images from his cell phone and in so doing, obstructed a federal grand jury investigation which was foreseeable to her.

Pursuant to U.S.S.G. § 2J1.2(c)(1) and U.S.S.G. § 2X3.1 the base offense level is 26. Given Ms. Cincinelli's timely acceptance of responsibility, a three-level reduction is applied for a total offense level of 23. Ms. Cincinelli has no criminal history points and is thus in a Criminal History Category I. The resulting sentencing range is 46-57 months. The Government has agreed to not recommend a sentence in excess of 60-months imprisonment and will move to dismiss the remaining counts of the superseding Indictment at the time of sentence. *See* Exhibit A, Plea Agreement, page 4, ¶¶5 a-b.

The Presentence Report comports with the Plea Agreement and the calculations therein. We agree that these are the appropriate guidelines under existing law. The Department of Probation recommends a sentence of 54-months imprisonment with special conditions outlined in the Department's Sentence Recommendation. These conditions include participation in a mental health treatment program, notification relating to internet use and cooperation with the United States Probation Office's Computer and Internet Management/Monitoring Program. We

2

respectfully submit that for the reasons set forth, *infra*, a sentence of time served is appropriate in this case along with post release conditions deemed appropriate by the Court.

### Applicable Law

In the aftermath of *United States v. Booker*, 543 U.S. 2020 (2005) and its progeny, a non-guidelines sentence is clearly within this Court's discretion. This Court now has "considerable discretion in identifying the grounds that can justify a non-guidelines sentence" *United States v. Jones*, 531 F.3d 163, 168 n.5 (2d Cir. 2008) [Raggi, J.]. The sentencing court, after first identifying the applicable guidelines range, can impose a non-guidelines sentence upon a finding of "sufficient justification" for the sentence imposed. *See Gall v. United States*, 552 U.S. 38 (2007). Indeed, "[a] sentencing judge has a very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. No limitation is placed upon the information concerning a defendant's background and the conduct in issue that can be considered by the court in making its sentencing determination. *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008); *see also*, 18 U.S.C. § 3661. After decades of strict adherence to a generalized and overly rigid guidelines structure, "Booker breathes life into the authority of district court judges to engage in individualized sentencing within reason in applying the §3553 factors to the criminal defendants that come before them." *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008)(*en banc*).

Judge Rakoff, in sentencing Rajat Gupta (11 Cr. 907 (JSR)) on a conviction, after trial, for securities fraud violations justified a non-guidelines sentence thusly: "[h]uman beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results."

*Booker* and its progeny universally embrace the discretion now afforded to district court judges who have "access to, and greater familiarity with, the individual case and the individual

defendant" to be sentenced to make the "individualized assessment[s]" so often constrained by the once mandatory guidelines. With this discretion we can trust that "every convicted person be considered as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue*." United States v. Jones*, 531 F.3d 163 (2d Cir. 2008); *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011).

The federal sentencing statute requires that the Court render an individualized sentence and consider the following factors in determining the sentence to be imposed:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A)     the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines —
…

(5) any pertinent policy statement—

(A)     issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy

4

> statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and
>
> ...
>
> (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct …

18 U.S.C. § 3553(a).

In fashioning an appropriate sentence, the overarching mandate of the sentencing court is the "parsimony principle" - to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553. *Pepper*, 131 S. Ct. at 1243.

We respectfully submit that a variance is warranted in order to fulfill this mandate. While the guidelines are an accurate mathematical computation, they do not sufficiently reflect the full emotional and factual landscape of this case or the extraordinary events which led up to the obstruction charge to which Ms. Cincinelli pled. It is these underlying facts and circumstances, along with Ms. Cincinelli's personal history, otherwise unblemished background, and the harsh conditions of her confinement during the COVID-19 pandemic which we submit, warrant the Court's consideration of a non-guidelines sentence in this case. They are respectfully detailed below.

============================================================

**B.  Summary of Argument**

Prior to the events which precipitated the plea in this case, Ms. Cincinelli had been, by all accounts, a law-abiding and productive member of society. While in high school and thereafter, she volunteered as a member of the Reserve Officers' Training Corps and the New York Guard. Upon her graduation from college she fulfilled her life-long dream of becoming a member of the

New York City Police Department, and for twelve years served as a decorated officer on the police force. She gave birth to and became a devoted mother of two beautiful children whom she misses dearly.

Since her arrest in this case, Ms. Cincinelli has endured close to two and half years in the harshest confinement in recent history as the COVID-19 pandemic invaded the globe and the prison system. She has been separated from the children she loves for this entire time and permitted only periodic bi-weekly calls with her young son, ██. She lost the job she loved as a police officer. And yet, despite the harshness of her confinement and the collateral consequences from her arrest and conviction, Ms. Cincinelli has shown the strength and fortitude to rise above her lapse in judgment and set herself right. Ms. Cincinelli has embarked on a steady path of self-reflection and guided rehabilitation while incarcerated and as a result, has reunited with her former self. As a reflection of this transformation, she has received accolades and letters of support from her fellow inmates and prison staff, as well as from her family and friends.

We do not seek to excuse Ms. Cincinelli's conduct which led to her standing before Your Honor. Ms. Cincinelli accepts full responsibility for her actions and the devastating impact they have had by those who were affected by it. We do seek to explain her actions as resulting from the extreme emotional pressure she was living under at the time and to assure the Court that Ms. Cincinelli has done the hard and necessary work to fully prepare herself to return to her family and rebuild her life in a law-abiding manner. Below we will explain how she got to the breaking point which precipitated her conduct. We seek to explain, not excuse. There is a difference.

Tucked between Ms. Cincinelli's first 33 years of success and productivity and her post arrest rehabilitative efforts was a period of darkness and emotional abuse that brought her to a place of anger and frustration so extreme that it altered her otherwise sound judgement and

sensibilities. It began when she met John Dirubba in 2017. It was at this time that her life started to unravel as a result of Dirubba's lies and manipulations. By his own words as reflected in his texts with Ms. Cincinelli's husband Isaiah Carvalho, he deliberately and diabolically sought to undermine Ms. Cincinelli's job security, and her mental and emotional stability. Her conduct during this period simply cannot be fully explained without understanding her physical, emotional and mental state during this time.

In a broken and compromised state Ms. Cincinelli uttered the unthinkable and dangerous words directed at her soon to be ex-husband and John Dirubba's daughter. At the time she had these conversations with Dirubba, she was angry, she was emotionally distraught, as Dirubba created and then facilitated the basis and platform for these nefarious conversations. The evidence clearly shows that she did not, however, pay him to hire a hitman and that she never believed that he did or would. When detectives arrived at her home and staged the murder of her husband, Ms. Cincinelli panicked and destroyed materials on her phone relating to prior conversations with John Dirubba and told Dirubba to delete images from his phone. She did so in a panic, fully realizing that she would likely be a target of any investigation which ensued.

Ms. Cincinelli has always been willing to accept responsibility for her conduct. Indeed, we began advocating for this plea shortly after the prosecution began. We remain grateful to the Government for re-evaluating the evidence and facilitating its proper and just resolution in terms of the plea. We now implore this Court to consider all of the facts and circumstances surrounding this matter and sentence Ms. Cincinelli in a manner that this Court deems just and proper.

To follow is a recitation of Ms. Cincinelli's life prior to her meeting John Dirubba and the trajectory it took during her relationship with him. We refer to these periods as the "before" and "during." The offense conduct is interwoven into this narrative. We end with Ms. Cincinelli's post

arrest rehabilitation and her commitment to returning to her former law-abiding and productive self. The is the "after." It is our hope that this documented historical perspective will demonstrate to this Honorable Court that Ms. Cincinelli's conduct, for which she takes full responsibility, was the aberrational product of a toxic and destructive relationship with John Dirubba. Given the success of her post arrest rehabilitation, we hope this Court will confidently conclude that Ms. Cincinelli can and should return to her family as a law-abiding, loving mother, sister, daughter and friend, and that she will successfully continue on her path of rehabilitation. Her family and friends anxiously await her return and will be there to support her.

### C.  Personal History, Characteristics and Family Circumstances of Valerie P. Cincinelli

*Good people will do good things, lots of them, because they are good people.*

*They will do bad things because they are human.*

Harold S. Kushner

***"Before"***



Valerie Patricia Cincinelli is 37 years of age and was raised in Long Beach, New York. She has two beautiful children, ███ and ██, aged 12 and 7 whom she loves dearly and from whom she has been separated since her arrest in this case. Ms. Cincinelli has two surviving brothers, Louie and Nick, and one sister, Melissa Hackworth. The siblings are pictured here at Nick's wedding. Louie and Nick are both employed and have remained supportive of Ms. Cincinelli since her arrest. Melissa is self-employed and also remains supportive of Ms. Cincinelli. Her oldest brother, Salvatore, "Sal," had been an FBI Special Agent for approximately eight years until his sudden passing in 2019. Sal committed suicide while at an FBI conference in Texas. He was 41 years of age, married and had two children. Ms. Cincinelli has been devastated by her brother's untimely passing.

Ms. Cincinelli was extremely close to her brother Sal her entire life. Indeed, she named her son after him. Sal was devastated by his sister's arrest and after working long hours as a Special Agent with the FBI, he spent hours reviewing the case with the undersigned in addition to visiting with Ms. Cincinelli to support her. Ms. Cincinelli continues to struggle with her brother's passing.

Sal's wife Danielle and her two young children have remained supportive of Ms. Cincinelli throughout this ordeal. *See* Exhibits B, C & D, letters from Danielle Cincincelli, ███████ and ████████. Ms. Cincinelli remains eternally grateful for this support. *See* Exhibit E, Letter from Valerie Cincinelli.

Ms. Cincinelli's father, Louis Cincinelli, was a police officer with the NYPD for 27 years before he retired.[1] Thereafter the family relocated to Virginia seeking a lower cost of living. Ms. Cincinelli was saddened by the move as she had established close bonds with her friends and relatives in New York. She returned home on holidays and summers and maintained her relationships with her family and friends, always intending to return to New York permanently. While in high school, Ms. Cincinelli joined the Junior Reserve Officer's Training Corps (ROTC). She continued on this path in college joining the army ROTC and majoring in criminology and political science. After her graduation, Ms. Cincinelli returned to New York where she fulfilled her life-long dream of becoming a police officer. She took the NYPD exam in 2006 and commenced employment as a police officer in 2007. She then joined the New York Guard.

Louis Cincinelli has submitted a letter in support of his daughter in which he recounts Ms. Cincinelli's determination to succeed as a child and her dreams to serve in his footsteps as a police officer:

> During high school she joined the JROTC to further her career goals of becoming a police officer. She went on to Longwood University where she studied criminal justice, graduated and joined the NYPD. Once married with children, she displayed all the attributes of a loving, nurturing mother.
>
> During her years at the 106 precinct she was honored as cop of the month several times. She even received a NY police foundation award for capturing a bank robber all by herself. Valerie also joined the New York State Guard, completed training with them, and

---

[1] Louis Cincinelli is also a veteran of the Vietnam war and was in the army reserves for twenty years.

attended all required drills and summer encampments. She also
wanted to join the US Army as soon as she retired from the NYPD.

*See* Exhibit F, Letter from Louis Cincinelli, Sr. In his letter, Mr. Cincinelli implores the Court to

"please let Valerie come home to her family. Those kids need their mother and I know that she

loves & misses them tremendously." *Id.*

Ms. Cincinelli's mother passed away suddenly in her sleep when Ms. Cincinelli was

approximately 18 years of age. Even at this young age, and while in college, Ms. Cincinelli made

sure that her siblings were well cared for in their mother's absence. Louis Cincinelli, Jr., describes

his sister as "more like a mother to me":

> I am writing this letter in regards to my big sister Valerie Cincinelli.
> Valerie is two years older than me, and when we were both in high
> school we moved from NY to VA and we lost our mother very
> suddenly and unexpectedly. Since then, Valerie has been more like
> a mother to me than a sister. She'd make dinner for me and my little
> brother most nights, and make sure we did our homework and help
> us with it if we needed, take us shopping for school clothes and
> supplies, and generally made sure we stayed out of trouble. I had
> such a good relationship with my sister that once I graduated high
> school I chose to go to the same college she was attending as well.
> She helped me make friends and kept me on track at college, where
> I studied business and she studied criminal justice. Valerie has
> always wanted to be a police officer for as long as I can remember,
> and as soon as she graduated college in VA she moved back up to
> NY and almost immediately, moved in with my older brother and
> became an NYPD officer. Valerie loved her job and I can recall one
> time where she single-handedly caught a bank robbery suspect, and
> another when she received a "cop of the month" award from the
> NYPD.

*See* Exhibit G, Letter from Louis Cincinelli, Jr. Louis also knows how remorseful his sister is and

how badly she wishes she could erase and re-invent the two years she spent with John Dirubba:

> I know she wishes she had a time machine and could go back to
> before she met John. This is not an excuse for her choice of
> vocabulary, but I know my sister's heart, and I know she's ready to

get back to being the great mother, sister, and contributing member of society she was her entire life.

*Id.* Danielle Cincinelli, Sal's wife and Ms. Cincinelli's sister-in-law who has known Ms. Cincinelli since 1995, witnessed her commitment to her siblings and the honorable path that her sister-in-law took in the ensuing years:

> Sadly, while Valerie was visiting NY over the Christmas break in 2002, her mother passed away suddenly in her sleep. Val was 18 years old. From an outside perspective, this seemed to be a turning point in her life. Aside from the absolute devastation that accompanies losing a mother at that age, Valerie had to grow up quickly and help her family. Despite being away at college at the time, Valerie stepped up and helped care for her younger siblings. She came home when she could during the week and most weekends to ensure her younger brothers were going to school, doing their homework, and participating in sports and activities. She was an important part of their lives growing up. She successfully graduated college and decided to apply for the New York Police Department.



> She was accepted into the NYPD academy and moved into NY to live with Sal and me while she began her training. Those few months with her living with us were such fun and she, Sal and I became very close. She worked incredibly hard and was dedicated to becoming an outstanding police officer. She studied constantly. After she graduated, she worked whenever and wherever the police department wanted her. She worked overtime, nights, days, weekends, and holidays to prove herself. Her career with the NYPD took her all over the 5 boroughs and to many areas of law enforcement including traffic, street police, undercover prostitution, and ultimately domestic violence.

12

*See* Exhibit B.

For twelve years prior to her arrest in this case, Ms. Cincinelli had served the public honorably as a New York City Police Officer. She underwent high intensity drug trafficking enforcement training and has received numerous accolades and awards from the police department for her excellent service. *See* Exhibit H, NYPD Certificates awarded to Valerie Cincinelli. She was honored for her instincts and courage in capturing a bank robbery suspect. *See* Exhibit I, Daily News Article. Ms. Cincinelli loved her job, and with every day on the force, she realized her life-long dream.



In addition to her service on the police force, Ms. Cincinelli joined the New York Guard, a military contingent that assists the National Guard when called into service in New York. This commitment was on a volunteer basis. In 2016, Ms. Cincinelli was awarded the Soldier of the Year Award. *See* Exhibit J. Steven Milito is a member of the 14th Detachment of the New York Guard and met Ms. Cincinelli at the Whitestone Armory in Queens. Ms. Cincinelli was brought in as a Specialist due to her experience as a police officer. Mr. Milito relates:

> Specialist Cincinelli was in my unit for approximately three years. She was a dedicated hardworking soldier. I could always count on her for numerous details such as, security at the Republic Airport for the Memorial Day Blue Angels exhibition as well as traffic control details with respect to other missions. Specialist Cincinelli was always quick to volunteer for missions and training exercises. She spent countless hours selflessly serving the people of the State of New York. Using her skills as a police officer she was a tremendous

asset in training the other soldiers to successfully complete their missions.

I observed Specialist Cincinelli on numerous occasions while deployed on missions and she always conducted herself in a professional and honorable manner. While having a positive professional manner, she was still able to be caring and sensitive to those who needed help.



*See* Exhibit K, Letter from Steven Milito. Mr. Milito also asks this Court for leniency for Ms. Cincinelli.

Jacinta Femenias worked with Ms. Cincinelli on the police force and has described for the Court Ms. Cincinelli's commitment to the police force and her dedication to her children:

> I have known Valerie for at least fifteen years, having had the pleasure of working with her and interacting with her on many occasions. For many years on patrol, Valerie demonstrated a sense of compassion towards everyone - her coworkers, civilians and victims of crime alike. She is a good person and a very dedicated mother to her two children, ▮▮ and ▮▮▮▮▮, who are just four and twelve years old. We often had conversations about life and our families, and these conversations made it clear to me that she is absolutely determined to give her kids the best life she can. In pursuing this dream, Valerie often worked long hours to provide for them. I was able to help her find proper caretakers for her kids so she could work. On many occasions, Valerie demonstrated empathy and good character, especially towards those who have experienced trauma. Having been a survivor of domestic violence herself, she naturally knew how to engage with victims of crime with humility and care. For that reason, she was placed in the Domestic Violence unit.

*See* Exhibit L, Letter from Jacinta Femenias. Ms. Cincinelli remains extremely proud of her tenure with the New York City Police Department. She loved her work and her record was unblemished

14

until shortly after she met John Dirubba. She has, as a result of her plea in this case, resigned from the police force.

Danielle Cincinelli writes of Valerie's commitment to the police force and to her children:

Outside of her career, Valerie's life changed immensely when she gave birth to her daughter, ████. ████ is the love of her life. She absolutely adores her. Her entire life shifted focus when ████ was born, from career oriented to being the best mother possible, making sure ████ was cared for and loved and had everything she wanted and needed in life. Valerie was a devoted, loving mother to ████ from the minute she was born. She worked whenever she could to make extra money to save for college and for fun and vacations. She joined the NY State Guard to help fulfil her own goal of public service, but also to eventually help ████ be eligible for the college benefits allocated to children of military parents. Additionally, despite her own complicated relationship with ████ father, Valerie wanted to make sure ████ always knew she had 2 parents who loved her. Valerie worked hard to make sure ████ had a positive relationship with her father and to always know she was loved. Every decision she made was with ████ best interest at heart.

Valerie's world seemed even brighter when her son, ██ ████ ████ was born. She was now the mother of two, engaged to be married to Isaiah and a new homeowner. She had bought a house in Oceanside, NY, less than a 5-minute drive from her brother Sal and our family's home. The idea was for us to live near one another so we could help each other out – 2 working moms with 2 kids and busy schedules. She wanted to ensure that our kids were always surrounded by family who loved them, fun and happiness. And that is exactly what happened.

*See* Exhibit B. Valerie spent every Sunday at her brother Sal and Danielle's home. This was a loving and happy family that took such good care of each other.

Debbie Kosta was like an aunt to Ms. Cincinelli and has known Valerie all her life and witnessed her growth and commitment to her family from early in her life, especially after Ms. Cincinelli's mother passed away:

> When Val was in her freshman year of college, her mom passed away from a major heart attack. This, as you can imagine, was devastating. While dealing with her own grief, Val would drive home every weekend to take care of her younger siblings. She was always the supportive sibling - emotionally and financially.
>
> As far back as I can remember, Val wanted to have a family of 5 like her mom and to be an NYPD officer like her dad.
>
> When Val graduated with a degree in criminal justice, she moved to NY to become a police officer. This was one of the proudest moments in her life.
>
> Valerie has 2 children: ███████ who is 11 and ████████ who is 7. Her children are her life. She was the mom who worked a 24 hour shift and still made it to the class trip. She was the parent that taught them to ride bikes, have good manners, and respect for others. ███ and ██████ always wanted to be with their mom. She was their hero - the parent who was there when they were sick, scared or just wanted someone to play with.
>
> Valerie would always find the time to be there for others when they needed someone. When I lost my son, Val helped me through my grief. When my father was in the hospital, she came and sat with me every night until the end.

See Exhibit M, Letter from Debbie Kosta. Ms. Cincinelli's brother Nick recalls his older sister's commitment to the family after the passing of their mother:

> Valerie was a huge part in my upbringing, as she would drive 2 hours back and forth every weekend during her time at Longwood to come home and take me to my basketball games, make sure I was doing well in school, and ultimately just being there for her little brother. She had to step up a little earlier than most due to the passing of my mother, and that has always been Valerie's

personality. She has always looked out for other people and made
sure that her own would always be taken care of.

*See* Exhibit N, Letter from Nick Cincinelli. Nick further relates Ms. Cincinelli's commitment to

her children both prior to and after her arrest as well as her acceptance of responsibility for her

actions:

The biggest example of that is her two children, ███, and ██.
She has and will continue to do
everything for her kids. The way
Valerie is as a mother is nothing
short of admirable. She has
constantly and consistently
worked hard and taken no
shortcuts as an NYPD officer to
make sure she provides for her
kids. She has consistently sent
birthday and holiday cards, not
only to her kids, but to the entire
family. She has taken
responsibility for her actions and
is ready to put this behind her and
move forward with her family. 

*Id.* Melissa Hackworth, Valerie's sister echoes the same sentiments for Ms. Cincinelli. *See* Exhibit

O, Letter from Melissa Hackworth. Ms. Cincinelli's daughter ███ has also written to express

her indefatigable love for her mother and how much she truly misses her. *See* Exhibit P, Letter

from ████████.

Rosemarie Cincinelli-Stevens is Ms. Cincinelli's aunt and has known this "young lady all

of her life." Ms. Cincinelli was "a good kid" who never got into trouble growing up. Ms. Stevens

describes Ms. Cincinelli as:

… a very loving and intelligent individual, raised as, and is a
practicing devout Catholic. She has always shown great respect to

our family members, including her parents, siblings Grandparents and myself. I have never known her to be mean spirited, angry or vicious. She is a devoted and loving Mother. Kept a beautiful home and created an appropriate environment for her children to thrive in. She never did drugs and rarely drank socially.

As a single parent, she was almost a superhero, managing to save money and buy her own home while supporting herself and little ███, juggling a fulltime demanding career as a Police Officer and being the loving and dotting Mother that she is. She made sure that her children had everything they needed and most everything they wanted. She has always been completely trustworthy and I have always been so very proud of her accomplishments.

*See* Exhibit Q, Letter from Rosemarie Cincinelli-Stevens. In addition to these letters, we attach herewith as Exhibit R, letters from the following family and friends:

- Patricia Baxter – Aunt
- Lenora Terzakos – Aunt
- Carly Nabet – Cousin
- Irene Feldbauer – Cousin
- Bobbi Jean – Friend
- Jean Sondergaard – Friend
- Antonia Gunder – Friend

These individuals have known and/or worked with Ms. Cincinelli for her entire life. They all describe a loving and committed mother, sister and daughter who mustered the fortitude to care for her siblings after the untimely death of their mother. They describe a woman who dreamed of a career in public service and who served honorably for twelve years. They describe a woman who never faltered in her commitments to her family, friends and the public. They also describe the sad fact that despite all of these positive and respectable attributes, Ms. Cincinelli was drawn to unhealthy and toxic relationships.

18

In 2007, Ms. Cincinelli became romantically involved with Erik Groh. On ███████

████, she gave birth to her daughter ██████. Soon thereafter, Ms. Cincinelli learned that ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

In the ensuing years, Mr. Groh and Ms. Cincinelli have made amends for the sake of their child and have had a healthy and productive relationship. Given the instant offense, Mr. Groh has full custody of ██████ and has given Ms. Cincinelli and her family unlimited access to ██████ Mr. Groh as well has submitted a letter to the Court in support of Ms. Cincinelli. *See* Exhibit S, Letter from Erik Groh. Mr. Groh has related that while their romantic relationship ended years ago, they have remained close friends and have co-parented their daughter, ██████ in a positive and productive way. Mr. Groh relates that Ms. Cincinelli is a devoted, doting and loving mother to ██████ and that he fully supports her and hopes to see her return to their daughter soon.

Ms. Cincinelli was introduced to Isaiah Carvalho in 2011 by her superior at the precinct, who was Mr. Carvalho's stepfather. They began a romantic relationship and then lived together in the home that Ms. Cincinelli purchased in 2013. On ██████████ their son ██████ ██████████ was born and the couple was married on May 17, 2014. The relationship deteriorated thereafter resulting in domestic incident reports being filed against Mr. Carvalho in Nassau County in 2016 and 2017.

After the first report in 2016, Mr. Carvalho participated in a court ordered anger management program and after the second report, Mr. Carvalho pled guilty to disorderly conduct

on August 7, 2017. *See* Presentence Report, page 12, ¶42. Orders of protection were issued in Ms. Cincinelli's favor in 2016 and 2017 with the second Order remaining in effect until Ms. Cincinelli's arrest in this case. *See* Presentence Report, page 12, ¶42.[2] Divorce proceedings were ongoing at the time of Ms. Cincinelli's arrest. In fact, a Settlement Agreement had been reached and was distributed for signatures in the weeks prior to the arrest in this case.

The deterioration of Ms. Cincinelli's relationship with Mr. Carvalho was witnessed by family and friends who were interviewed by the Department of Probation. *See* Presentence Report, page 12, ¶43. While the relationship surely deteriorated, it was not particularly contentious. They had grown apart and were getting divorced.[3]

To be sure, these were two difficult and at times toxic relationships. And yet, Ms. Cincinelli remained stable and was prepared to move forward with her children, her family and her position at the NYPD. This is who Valerie Cincinelli was for the first thirty-three years of her life. This life of stability, success and service was gradually and tragically eroded after Ms. Cincinelli met John Dirubba.

===============================================================

***"During"***

Ms. Cincinelli met John Dirubba in 2017 as her relationship with her then husband Isaiah Carvalho was deteriorating. Ms. Cincinelli was on a domestic incident call when Dirubba, who was twenty years her senior, approached her. He continued to solicit her affections and they exchanged contact information. He then began showing up at the precinct greeting her with coffee.

---

[2] Subsequent to her arrest in this case an order of protection was granted for Mr. Carvalho by the Supreme Court in which their divorce proceedings are pending.

[3] Mr. Carvalho spoke with the Department of Probation via phone and discussed the divorce proceedings and Ms. Cincinelli's supposed displeasure with the outcome and denigrates the Government for its handling of this case. The fact is that a Settlement Agreement had been reached and was distributed for signatures. Mr. Carvalho was to receive a portion of Ms. Cincinelli's pension for a limited period of time. She owned the home prior to the marriage, which lasted less than two years.

She fell for him and they began a relationship. Within months, Ms. Cincinelli began distancing herself from her family. Several family members became concerned as they viewed Dirubba with a suspicion and distrust that would be confirmed by his conduct in the two years that followed.

Danielle Cincinelli and other family members noticed a dramatic change after Ms. Cincinelli met Dirubba:

> We learned that in early 2018 Val had met a man who was supposedly a "retired former undercover FBI agent" and the 2 were in a relationship. My husband, an FBI agent, was consumed with a feeling that something was not right with this man.
>
> That man was John DiRubba.
>
> Once DiRubba was in the picture, Valerie's life seemed to be caving in around her. There was constant stress and drama in her life. She was hardly present in our lives. We still saw her for holidays and birthdays, but time was limited as DiRubba was often waiting in the car for her or texting her about when she would be home. We heard quick stories from her about how he was manipulating her and threatening he would tell the NYPD she threatened him if she tried to break up with him. She assured us she had a lawyer, "had everything under control", and was trying to figure out how to end the relationship. She could not speak on the phone when he was around and did not keep her phone on when he was around for fear he would read her texts and possibly see that her family was trying to convince her to get out of that relationship.

*See* Exhibit B. As things continued to deteriorate, Danielle began to notice the physical and emotional toll Dirubba had taken on Ms. Cincinelli:

> From this point forward, things went from bad to worse in early 2019. Val was in trouble at work and reassigned from her precinct…the precinct where Isaiah's stepfather also worked. She was attacked, injured, and nearly raped in the Brooklyn Courthouse where she was reassigned. She suffered PTSD from the attack, months of pain from her shoulder injury and terrible insomnia. She

eventually required surgery for her shoulder injury. The NYPD physician prescribed her anxiety medication, pain medication and sleeping medication. Despite all of this, she sent texts to me that she thought she was dying given the physical symptoms the lack of sleep and constant anxiety were causing. We hardly saw her anymore. One evening while in our local pharmacy I saw her and hardly recognized her. She was completely emaciated and looked frighteningly thin. She was pale and stoic. John was with her – it was the first time I met him face to face. I would only meet him once more in the early spring of 2019, when I went to her home to check on her after her shoulder surgery.

*Id. See also*, Exhibit L, Letter from Jacinta Femenias. Debbie Kosta, a lifelong aunt to Ms. Cincinelli also witnessed Ms. Cincinelli's emotional and physical downfall at the hands of Dirubba:

When Val met John DiRubba, she thought she had finally met a man who could be there for her. He told her he was a retired FBI agent (she had seen him go in and out of the FBI building so she had no reason to disbelieve him). As time went on, she began to realize he was a con artist. I would speak to her about trying to get away from him. She told me she was trying but was afraid. John DiRubba had lied to the NYPD and created a lot of problems with her job. By this time, Val had lost 30 lbs and had told me she did not sleep because she was afraid of him. He would threaten to make up lies and call CPS or hurt himself and call the police saying she did it. Val felt completely helpless.

Valerie's brother was an FBI agent. Valerie confided in him and asked for help. He took her to the FBI office and had them write a report. She was told they don't handle domestic issues. I wish they would have looked into her case.

*See* Exhibit M. These letters stand as a chilling account of the emotional and physical deterioration Valerie underwent while she was with John Dirubba. To follow are the details of that relationship.

Within the first few months of their relationship, Dirubba revealed himself to be a manipulative and overly possessive individual. He was also a financial drain on Ms. Cincinelli. He used her credit card on occasion without her permission and constantly borrowed money from her.

He stole several pieces of her and her children's jewelry. Upon being confronted, he denied the theft. Later, he admitted to taking the jewelry and sporadically returned the pieces over the course of eight months. *See* Exhibit T, Text Messages between Valerie Cincinelli and John Dirubba. Dirubba stalked her and constantly called and texted her to find out where she was. When Ms. Cincinelli finally attempted to terminate the relationship, Dirubba began an onslaught of false accusations that combined to gradually upend her entire life. This eventually crippled Ms. Cincinelli professionally, physically and emotionally – just as described in the letters, *supra* -as everything she had worked for and accomplished over the past decade fell apart.

The first time Ms. Cincinelli threatened to kick Dirubba out of the house he called her incessantly begging her to reconcile. She remained resolute, refusing his overtures and resorted to changing her phone number several times. At one point, she went to her brother Sal, and he advised her to file a report with the FBI. She did, but to no avail. *See* Exhibit U, FBI, Internet Crime Complaint. Dirubba then filed what he later admitted was a false complaint with the NYPD Internal Affairs Bureau (IAB) and had her arrested in Queens, alleging that Ms. Cincinelli had threatened him with a gun. She was placed on modified duty, stripped of her gun and transferred as a result of this complaint.

When she continued to refuse his overtures to reunite, Dirubba retaliated by filing a criminal complaint which resulted in her arrest in Queens County for Criminal Contempt and Aggravated Harassment. ████████████████████████ He also filed a request for an Order of Protection in Family Court, Queens County, in which he again alleged that Ms. Cincinelli threatened him with her gun. ████████████ At some point, Dirubba even accused her of child abuse. This precipitated yet another IAB investigation and additional discipline by the police department. Ms. Cincinelli was assigned to arraignments in Kings County. While she was

23

escorting a prisoner to his cell he physically assaulted her and attempted to rape her. Ms. Cincinelli suffered a rotator cuff injury which required surgery as well as the residual trauma of almost being raped. The perpetrator pled guilty to this assault and is serving a two-year sentence.

As set forth below, these allegations were all admittedly and demonstrably false and part of an insidious and vicious plot between Dirubba and Ms. Cincinelli's husband Isaiah Carvalho to destroy her life. Dirubba, playing both sides, lodged the false allegations in retaliation for Ms. Cincinelli breaking up with him and to assist Carvalho and then withdrew them if Ms. Cincinelli agreed to reconcile.

As litigation surrounding these several allegations by Dirubba drew near, Dirubba submitted a ███████████, through counsel, █████████████████████ ███████████ █████████████████████████ ████████████████ ███████████████████████████████████ █████████████████████████████ The damage, however, was done. ███████████████████████████████ █████████████████████████████████████████ly ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ █████████████████████ █████████████████████████████ ████████████████████████████████████nd █████████████████████████████



As a result of Dirubba's admissions, the criminal charges were dismissed on April 13, 2018. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The child abuse complaint was returned "unfounded." ▮▮▮▮▮▮▮▮ All of the Orders of Protections were withdrawn. The IAB investigation, however, continued. By this time, Ms. Cincinelli's life had been literally turned upside down.

The documented evidence set forth below points to a specifically detailed and finely executed plot against Ms. Cincinelli that is worthy of a film script. As detailed below, the diabolical conspiracy was replete with the vengeance, loathing and misogyny of two foul-mouthed men being hurled at one unsuspecting woman. It involved documented lies and false allegations calculated to destroy and torture her. And they did just that. They put everything she held dear – her children and her job and her own personal safety – at risk. As a result of the impact of their plot – with the steady unraveling of the life she had built – Ms. Cincinelli became emotionally unstable. She

---

[4] We corroborated that in fact, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

became a physical, emotional and mental wreck - just what the obscenely vile texts between these two men, some of which are reproduced, *infra*, demonstrate they had hoped to accomplish.

As early as December 2017, Dirubba repeatedly told Carvalho that he needed to ████████ ████████ and suggested that Carvalho call child services.[5] *See* Exhibit CC, pages 18 and 19, messages 52 and 58. On several occasions he told Carvalho exactly what to accuse her of. On December 8, 2017, Carvalho wrote ████████████████████████████ and ████████████████████████ to which Dirubba responded ████████████████ ████████ *See* Exhibit CC, page 21, messages 1-7[emphasis added]. The day before, Dirubba stated ████████████ to which Carvalho responded, ████████ *See* Exhibit CC, page 26, messages 1 and 2.

And then, on January 17, 2018, a year before Dirubba went to the FBI with his supposed plot information, in a clear indication that the two were working together, Carvalho told Dirubba ████████████████████████████ *See* Exhibit CC, page 1, message 4. Earlier that day, Dirubba told Carvalho ████████████████████████ *See* Exhibit CC, page 2, message 4. Carvalho called Ms. Cincinelli a ████████████████████████ and stated ████████████████████████████ ████████ *See* Exhibit CC, page 3, messages 11, 16, 17 and 18. Earlier that month Dirubba had stated: ████████████████████ *See* Exhibit CC, page 4, message 1[emphasis added].

There can be no question but that Carvalho and Dirubba were coordinating to ruin Ms. Cincinelli's life. Dirubba told Carvalho they ████████████████████ and that he needed

---

[5] Dirubba and Ms. Cincinelli met in 2017. These texts clearly were not the first communications between Dirubba and Carvalho.

Carvalho's help. *See* Exhibit DD, page 1, messages 5 and 6. Dirubba specifically stated ██████████ ███████████ to which Carvalho agreed stating ██████████████████ *See* Exhibit DD, page 1, messages 1-3.

Indeed, Dirubba in his apparent hatred for Ms. Cincinelli and his need to put her ███████ ███████ went a step further and explicitly stated, ██████████████████ ████████ ███████████████ *See* Exhibit EE, pages 1 and 3, messages 8 and 24. At one point Dirubba described his preferred method to kill Ms. Cincinelli, stating ██████████████████ to which Carvalho responded ██████ Dirubba then asked Carvalho ███████████████ ██████ *See* Exhibit FF. This was all occurring while Dirubba was simultaneously professing his undying love to Ms. Cincinelli and while denigrating Carvalho to her.

In January 2018, as the various criminal complaints and IAB investigations were ongoing, Dirubba told Carvalho that they ██████████████████████ A few days later, Dirubba stated ██████████████ to which Carvalho responded, ████████████████ ██████████████ *See* Exhibit CC, page 8, message 24 and page 9, messages 1 and 4. Here again is the implication of a coordinated strategy to file and support false allegations against Ms. Cincinelli and evidence of their gloating over the fact that she would soon know that they were plotting against her.

Equally disturbing, and also during this time, Dirubba was exchanging text messages with ██████████████████████████████. In these text messages, ████████████ ██████████████████████████████████████ ███████████████████████████████████ To further exacerbate this unholy alliance with ██████████████ , after Ms. Cincinelli's arrest the Government informed us, in a *Brady* disclosure, that Dirubba had ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████

We have and continue to acknowledge the ugly and vile words spoken by Ms. Cincinelli. Clearly, the words spoken by Dirubba and Carvalho are equally vile. We do not necessarily assign or allege murderous intent to the vitriol exchanged between Carvalho or Dirubba, just as we fervently submit that Ms. Cincinelli never actually wanted or intended that Carvalho or Dirubba's daughter should be killed. But there is a difference here. Carvalho and Dirubba were not under any stress at the time they conspired in such graphic and obscene detail to ruin Ms. Cincinelli's life. Instead, as the texts make painfully clear, they were positively gleeful as they pulled the strings that tormented Ms. Cincinelli and caused her unbearable stress. They were, in fact, reveling in their devious plot; having fun as they worked to destroy her and the life she had built. And they each had something to gain from it – for Dirubba it was money, for Carvalho it was a favorable divorce settlement and simple vengeance.

By contrast, Ms. Cincinelli was under unfathomable stress when she uttered the words on the tapes. She was truly at an emotional breaking point – a point reached due to the efforts of Dirubba and Carvalho. As described by her family and colleagues, she became emaciated and withdrawn.  She lost nearly thirty pounds, she could not sleep, she was afraid and was emotionally compromised. She was also angry and frustrated. After Ms. Cincinelli had suffered all that Dirubba

---

[6] Additionally, while the matter was pending, the undersigned was contacted and provided with dozens of voicemail messages Dirubba had left for his ex-wife during which he referred to both his ex-wife and his daughter in terms we will not put in words in this submission, threatening lethal physical harm to both of them. We will provide these voice messages to the Court under seal if requested.

and Carvalho had created - the theft, the fear, the lies and the false charges filed against her by her supposed lover, the demotion in her job which resulted in her being sexually and physically assaulted - she sank so low to have engaged in these conversations - conversations that Dirubba facilitated knowing that he had, by now, driven her to distraction. If Dirubba was the loving and distraught man in love with Ms. Cincinelli as he has professed to this Court and the press, and if Ms. Cincinelli had seriously proposed murdering her husband and Dirubba's daughter, and if he was so aghast at the proposal why not go to the FBI immediately? Why not calm her down? Get her help? Tell her she was just too stressed? Why would he go along with her? The answer is so clearly demonstrated by the facts detailed above. It's because he purposefully caused her emotional breakdown and was setting up his final salvo to destroy her.

Moreover, Dirubba and Carvalho followed through on their plot to ruin Ms. Cincinelli. They acted on their words. As amply demonstrated by the evidence, notwithstanding her statements on the tapes, she never paid Dirubba to actually hire a hit man and she never believed he would or that he would kill anyone. Ms. Cincinelli engaged with Dirubba mockingly, twistedly, but she never intended that any harm come to Dirubba's intended victims. This is a fact borne out by the evidence and, we submit, the Government's appropriate and responsible decision to dismiss the murder for hire charges.

Dirubba brought this "murder for hire plot" to the FBI in May 2019, but he alleged that the plot was hatched in February 2019, when Ms. Cincinelli gave him $7,000.00 to pay for a hitman. Not surprisingly, none of these preparatory conversations were taped. That Ms. Cincinelli gave Dirubba $7,000.00 was true, and the FBI dutifully corroborated this with photographs from the bank and bank records. That she gave him this money to pay a hitman was clearly a lie. In dozens of text messages from Dirubba to Ms. Cincinelli begging her to reconcile, he repeatedly admitted

that he owed her $15,600.00, a portion of which was the $7,000.00 that she gave him in February 2019. Indeed, Ms. Cincinelli provided Dirubba with a list of the different debts. One entry on the list was the $7,000.00 she lent him in February 2019 to purchase gold coins as an investment – money which he falsely claimed to the FBI was for a hitman. ██████████████████████████

████████ This revelation is sufficient by itself to put the lie to Dirubba's claim of a murder for hire plot. But there is more.

When detectives arrived at Ms. Cincinelli's home to inform her that Mr. Carvalho had been killed, she became hysterical as she expressed her disbelief of what she was being told. What occurred after the detectives left her home is critical in evaluating Ms. Cincinelli's true intent. The conversation which ensued between Ms. Cincinelli and her alleged accomplice speaks volumes as to whether she ever intended harm to befall anyone. After the police had left and Ms. Cincinelli continued crying uncontrollably, Dirubba again attempted to elicit an incriminating response from her. He took a chance and asked Ms. Cincinelli why she was crying and then, trying to bait her, stated, "[y]ou knew this was going to happen." Ms. Cincinelli, weeping uncontrollably, responded *"I didn't believe you. I never believe you. You … lie about everything."*

Dirubba continued on his quest to lure Ms. Cincinelli into incriminating herself to no avail. Ms. Cincinelli repeated, again and again, "I really, I like really, really can't believe this. Like I thought you were full of shit. You're always full of shit. You f…ing lie about everything." If Ms. Cincinelli truly believed that Dirubba had hired a hit man to kill anyone, and if she truly intended that anyone would be killed, this private moment between the two conspirators would have celebratory. Perhaps even congratulatory of Ms. Cincinelli's crocodile tears. But no. Ms. Cincinelli

---

[7] This was not the first time Ms. Cincinelli lent Dirubba money to buy and sell gold. Indeed, Dirubba purchased gold from Ritz Jewelry months earlier. He was later accused of robbing the same vendor in New York County.

was unwavering in her utter disbelief that Dirubba would have ever hired a hit man or had anyone killed.

Indeed, there is absolutely nothing that occurs at this critical juncture in this alleged plot that could possibly be construed as evidence of a mutual conspiracy, or that could support a claim that Ms. Cincinelli wanted to literally have anyone killed. In fact, all that occurs at this moment proves the exact opposite. Listening to Ms. Cincinelli's voice and intonation and the level of hysteria she reached, one can draw no other conclusion but that she never intended for anyone to be killed. There was no audience for her to play to. It was just her and Dirubba. And her hysteria and disbelief are manifest. And Dirubba knew her tears were genuine because he knew that she, like him, had been engaging in a macabre dialogue that was never intended to come to fruition. Her comportment when the fake reality that had been presented to her during this private moment between her and her alleged accomplice is revelatory.

Similarly, on the tapes Dirubba repeatedly referred to needing more money for his hit man. Despite his fishing, Ms. Cincinelli never took the bait because, in fact, she never gave him money for this purpose. Never at any time does Ms. Cincinelli refer to having already given him money for a hit man.

Finally, we ask the Court to consider this simple fact. For months prior to the taping of these conversations, Ms. Cincinelli repeatedly kicked Dirubba out of her home because he had stolen from her and had repeatedly lodged false allegations against her. If Ms. Cincinelli truly believed that she was about to commit murder with the assistance of her lover, it defies common sense that she would at the same time enrage him by repeatedly kicking him out of her house. She knew he was capable of filing false allegations against her when provoked and this is precisely what he did when he went to the FBI with his murder for hire plot.

During her relationship with Dirubba, Ms. Cincinelli uttered the unspeakable and she truly regrets this. But she never paid Dirubba to hire a hitman and she never intended or thought that anyone would actually be harmed. She did, however, obstruct justice when she deleted materials on her phone and directed Dirubba to delete images from his phone. She did this intentionally, aware that the investigation would surely focus on her. She has always accepted responsibility for this conduct from the onset of this prosecution. She fully recognizes that as a police officer, she was breaking the law.

===========================================================

As this Court is aware, we have made these factual arguments during the bail litigation on more than one occasion to no avail. And yet, as we all know, there is a difference between a detention analysis and determining how long to further incarcerate a human being and how best to address the goals of punishment.

As the Government has now agreed to dismiss the murder for hire charges, the undersigned thought long and hard as to whether to include these facts and circumstances in this submission. However, the Presentence Report references the tape-recorded conversations, and we are fairly confident that the Government will do the same in an effort to demonstrate that who Ms. Cincinelli was then, is who she is now. As such, and as a sentencing court may consider underlying conduct at the time of sentence, we felt compelled to address these facts in this submission.

We have considered the notion that this presentation will be construed as one of shifting blame. For the obstructive conduct to which Ms. Cincinelli has pled, we do no such thing. These were intentional acts, whether in a panicked state or not. They were illegal and a price has been and should have been paid by Ms. Cincinelli. However, to ignore the events leading up to the insidious words uttered by Ms. Cincinelli - words that can weigh so heavily on this Court's analysis

32

- would be irresponsible. These words must be considered in their true context and in light of Ms. Cincinelli's otherwise law-abiding and productive life. She did not wake up one morning and become totally unhinged. She was driven there.

It is our hope that after considering the facts and circumstances under which these statements were made, this Court will appreciate the stark contrast between the honorable and productive life Ms. Cincinelli led prior to meeting John Dirubba and her comportment and conduct while she was with him. In doing so we are hopeful that the Court will fashion a sentence that will give due credit for the time she has served and to facilitate both the continuation of her rehabilitation and her re-integration into society as an even better, healthier woman than she was prior to meeting Dirubba.

========================================================

*"After"*

We have set forth, *supra*, the "before" and "during" Dirubba descriptions of Ms. Cincinelli's life. To follow is the "after" – the two and a half years following her arrest and incarceration. The deep self-reflection described in her letter to this Court, as well as her exemplary conduct in prison, demonstrate the sincerity of her commitment to rehabilitation. It also demonstrates her compassion and commitment to those around her – to her family and friends and to her fellow inmates at the MDC who only two and a half years ago she would have been arresting. Indeed, it is noteworthy that as a police officer, Ms. Cincinelli could have been at great risk at the MDC. Admittedly, the undersigned considered requesting protective custody. But she clearly didn't need that. Her good character and rehabilitative efforts allowed her to engage in the relationships detailed in the letters submitted by her fellow inmates.

33

During the last 29 months, Ms. Cincinelli has taken myriad steps to regain her emotional footing and has embarked on a multi-faceted path to rehabilitation. These steps bear witness to the fact that she is wholly committed to returning to her children and society as a healthy and productive individual and as an even better woman than she was before she she engaged in the conduct to which she has pled.

Ms. Cincinelli has submitted a letter for the Court's consideration in which she thanks this Court for taking her case after the tragic passing of Judge Feuerstein. She truly appreciates this Court's willingness to facilitate a timely resolution to this matter under such tragic circumstances. Ms. Cincinelli provides the Court with her childhood memories and relates how she always dreamed of being a police officer and helping others. Ms. Cincinelli then addresses her words in the recorded conversations and acknowledges her downfall after meeting Dirubba:

> I'm sure you are confused how the person I'm describing to you is the same person on that recording. Your Honor since the day I met John Dirubba my whole world began unraveling. He showed me a kind of humanity that I didn't know existed. He completely manipulated, bribed, and destroyed me for nearly two years of my life. The constant stress he caused me made me very anxious and depressed …

*See* Exhibit E, Letter from Valerie Cincinelli. Candidly addressing the taped conversations, Ms. Cincinelli states:

> Your Honor, I unraveled. Those recordings are my voice, my words, but <u>NOT</u> my intentions. I could never and would never hurt anyone. I was so distraught at that time and was merely venting my entire lifes frustrations. I own my words, I acknowledge them and I sincerely apologize for them. When I hear them myself, my skin crawls with disgust and embarrassment. There is no way to justify them, nor would I want to. Those words are not me. I only hope that I can explain my situation and why I was feeling such anger at that time.

*Id.* Ms. Cincinelli fully acknowledges the "horrible decisions" she made and asks for a "second chance at life." She misses her children dearly and laments the date of her arrest and how it caused her to miss picking up her son and spend the day as they had planned. She further grieves the loss of her brother:

> Please let me go home and grieve the loss of my older brother and best friend with my family. I still want to think I'm going to go home and go to Sal's house and see him. I haven't accepted that he is gone. I need to visit his grave and I need to hug my niece, nephew and sister in law who have unconditionally had my back my entire incarceration.

*Id.* Ms. Cincinelli concludes her letter with "I am better off healed, then I ever was unbroken."[8]

As a result of the deep work and introspection she has committed herself to while incarcerated, Ms. Cincinelli is fully able to understand the person she became as her life began to unravel. She understands the destructive nature of her past relationships and she knows that she must continue to do the work necessary to ensure that she never allows herself to travel that path again. She has listened to the tapes of her conversations with Dirubba and is sickened by them, and she recognizes that she must guard her mental state so that she never loses control of herself and her words again. Through her therapeutic work at the MDC, Ms. Cincinelli has been able to clearly see who she became during this dark period in her life and she regrets with every fiber of her being the fact that, that person actually existed within her. She is, as a result of that recognition fully and completely committed to continue her path of rehabilitation – whether she is allowed to return home or remain incarcerated. She has found herself again and she will never go back. She spent her life doing good. She faltered because she is human.

---

[8] Ms. Cincinelli read this quote while incarcerated and it has stuck with her. She acknowledges that attribution to another is warranted, however, she did not have the author in hand when she drafted the letter.

Ms. Cincinelli has engaged in a great deal of introspection regarding her behavior and has become a mentor and friend to the inmates with whom she has been confined. Ms. Cincinelli has participated in over eighty programs for which she received the attached certificates. *See* Exhibit JJ, MDC Brooklyn Education Department Certificates Awarded to Valerie P. Cincinelli. These include participation in Women's Relationship Group, Initial Suicide Watch Companion Training, Alternative to Violence Program, Basic Fit Sentry Class, Trauma in Life Workshop, Blood Pressure Sentry Class, and many more. Ms. Cincinelli has taken every single class that has been made available to her. She has also taught several classes to inmates. In addition, Ms. Cincinelli has worked several jobs at the facility and has received stellar work performance ratings. *See* Exhibit KK, BOP Inmate Work Performance Ratings.

Finally, as noted, *supra*, Ms. Cincinelli has become a mentor to her fellow inmates, helping them through their shared ordeals. We attach herewith several letters from her fellow inmates. *See* Exhibit LL, Inmate Letters in Support of Valerie P. Cincinelli.

Kotarra Jackson has known Ms. Cincinelli since her arrival at the MDC, two and half years ago:

> … I'm a person with disabilities and Valerie has been so helpful to me. She help me with task that I am unable to do and she inspire me to do better. We live with 40 plus females and everyday isn't always a good one especially with the animal like conditions that we are subjected to. These 2 and a half years have been ruff [sic] Your Honor. Imagine being in this type of setting with all the bias situations in the world where cops are targeted. In here many of us come from different walks of lifes however this pandemic brought us all together. Valerie is a really good person Judge Seybert and she deserve another chance to be a productive member of society.

*See* Exhibit LL, Letter from Kotarra Jackon.

Noelle Velentzas relates how much Ms. Cincinelli helps other inmates and tries to lift their spirits. As for Ms. Cincinelli's remorse for her conduct, Ms. Velentzas relates that Ms. Cincinelli

is "very hard on herself for being in here. She is ashamed to have allowed such a situation to take her away from the only people who matter to her. She feels like she let them down. She struggles to forgive herself." *Id.*

MDC Chaplain, Reverend Ngozi Osuji, attests to Ms. Cincinelli's "regrets for the mistakes that brought her behind bars." Reverend Osuji believes Ms. Cincinelli is "deeply remorseful and truly sorry" for her conduct and "she wishes she could close her eyes and see the hands of the clock reverse and do things differently." *See* Exhibit MM, Letter from Rev. Ngozi Osuji.

Many of her fellow inmates express their gratitude to Ms. Cincinelli for the care and mentorship she has shown them. She helps them celebrate their birthdays and does her best to convince them that they will survive the situation in which they have found themselves. Indeed, a component of her own rehabilitation is advancing the rehabilitation of others. They have all witnessed Ms. Cincinelli's love for her children and how guilty she feels for the time she has spent away from them.

She has accomplished this while, as detailed, *infra*, incarcerated in the harshest prison conditions in over a century.

### D.  *The Conditions of Confinement at the MDC in General and Those Implemented in the Wake of and During The COVID-19 Pandemic*

Over the past several years, the arduous and at times dreadful conditions at the MDC have become a persistent concern for the well-being of inmates and our courts in assessing the impact of these conditions on incarcerated individuals. This Court is surely aware of the power outage and the ensuing deterioration of the conditions at the MDC in January, 2019. While this preceded Ms. Cincinelli's incarceration by four months, the investigation of the incident revealed the longstanding deplorable conditions at the facility.

Judge Analisa Torres visited the detention center as part of a fact-finding hearing and described cells with water leaks coming from the ceiling, peeling paint, a mold covered light and water-stained bedding.[9] One cell had abundant water damage and inmates interviewed described the conditions under which they had been confined consistent with Judge Torres' personal observations. These conditions were not caused by the outage but were clearly pre-existing conditions long complained about. Many of these concerns were investigated and addressed by the Office of the Inspector General in a report dated September, 2019.[10]

While this report noted several deficiencies at the facility, it was based in large part on statements made by prison officials.[11] Indeed, after the New York Times reported the story, officials at the facility stated that the power failure had "minimally" affected the facility.[12] This was simply not the case.

A week after the crisis, the facility was also visited by Representative Jerrold Nadler. Representative Nadler observed "[t]here's a total lack of urgency or concern on the part of the prison administration with respect to getting the heat and the hot water, getting the services we need … [13] While some cells did have heat, others were extremely cold … and all were without power." *Id.* These observations were clearly a more accurate reflection of the actual conditions at the facility. While the fire and power outage rendered the conditions unbearable, the

---

[9] *See* The Intercept, *The Power is Back On at Brooklyn Jail, but a Visiting Federal Judge Found Untreated Gunshot Wound, "Black Blotchy Mold," and Ongoing Crisis*, https://theintercept.com/2019/02/06/mdc-brooklyn-metropolitan-detention-center-federal-judge-tour/.

[10] *See* Office of the Inspector General, *Review and Inspection of Metropolitan Detention Center Brooklyn Facilities Issues and Related Impacts on Inmates*, https://oig.justice.gov/reports/2019/e1904.pdf.

[11] *See* The Intercept, *Inspector General Report Treated Freezing Federal Jail as a PR Blunder Rather than a Humanitarian Disaster*, https://theintercept.com/2019/09/28/mdc-brooklyn-jail-heat/; ["the report does not address the chronic deception in jail officials' statements during and after the crisis"].

[12] *See* The New York Times, *How We Learned About the Freezing Federal Jail in New York*, https://www.nytimes.com/2019/02/09/reader-center/metropolitan-detention-center-cold-jail.html.

[13] *See* The Intercept, *Vicious and Brutal – Life Inside a Freezing Federal Prison with No Heat*, https://theintercept.com/2019/02/02/federal-prison-no-heat-new-york-nadler-mdc.

conditions at the MDC have been horrendous for years and have provided a basis for a variance. *United States v. Morgan*, 19 Cr. 209 (RMB)(S.D.N.Y. May 5, 2020).

In addition to the general sub-standard conditions at the MDC, the lack of medical treatment has long been an issue there and has adversely affected Ms. Cincinelli in particular since her arrest and detention. As detailed, *supra*, Ms. Cincinelli suffered a rotator cuff injury after being attacked by a prisoner in Brooklyn. She had surgery and was in need of further treatment. Despite Judge Feuerstein's Order, D.E. 17, dated June 18, 2019 and Ms. Cincinelli's repeated attempts to secure this treatment, it has not been properly attended to. Ms. Cincinelli suffers daily with pain in her shoulder.

On December 17, 2020, Ms. Cincinelli was seen by Dr. Bialor at the MDC Chronic Care Clinic. *See* Exhibit NN, BOP Clinical Encounter Report. Dr. Bialor requested an X-ray of Ms. Cincinelli's shoulder and an "offsite" consultation with an orthopedist as Ms. Cincinelli "never regained mobility" in her shoulder and "still gets pain with movement." *Id.* While an X-ray of Ms. Cincinelli's shoulder was taken at the MDC in March 2021, after two years of incarceration, it wasn't until September 27, 2021, Ms. Cincinelli was finally taken outside of the MDC for further diagnosis. She is yet to visit an orthopedist. Her other medical needs such as dental treatment and her recent request to see a doctor for a knee and ankle injury sustained after falling due to a leak from a broken water dispenser have been ignored.

To further exacerbate these longstanding conditions and lack of adequate medical treatment, the COVID-19 pandemic precipitated the most restrictive prison conditions in our lifetime. As the Court is surely aware, the impact of the pandemic on the inmate population has been devastating. Since the onset of the pandemic, there has been a clear judicial recognition of the unintended but nevertheless exacerbated toll the prison conditions have taken on inmates. Even prior to the onset

of the COVID-19 pandemic, courts recognized that periods of custody prior to sentence in "unusually arduous conditions" merited recognition by courts in "measuring the just sentence" to be imposed *United States v. McRae*, 17 Cr. 643 (PAE)(S.D.N.Y. January 15, 2021); *United States v. Carty*, 264 F.3d 191, 196-197 (2d Cir. 2001).

The pandemic has been resoundingly recognized as having precipitated conditions to be taken into account at sentencing. In *United States v. Juan Carlos Aracena de Jesus*, 20 Cr. 19 (S.D.N.Y. July 1, 2020), Judge Englemayer, reflecting on the "worst pandemic in this country during the past 100 years" stated:

> Prison is supposed to be punishment, but it is not supposed to be trauma of that nature or close … Any mature system of justice, any thoughtful judge in imposing the reasonable here would have to recognize the unexpected and regrettable ardors that you experienced since your arrest …

*Id.* Less than a year later, as the pandemic continued its onslaught on society, the court In *McRae,* held:

> In the Court's judgment, a day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.

*See also United States v. Rodriguez*, 00 Cr. 761-12 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. September 30, 2020)["the pandemic, aside from posing a threat to [a defendant's] health, has made … incarceration harsher and more punitive than would otherwise have been the case. This is because federal prisons … have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal"]; *see also United States v. Nkanga*, 18 Cr. 713 (JMF), 2020 WL 1529535 at *1 (S.D.N.Y. March 31, 2020).

Since the onset of the pandemic and for close to sixteen months thereafter, Ms. Cincinelli has suffered a near complete lockdown in the facility during which she has been often confined to her bunk for up to 20 hours per day. During this time, Ms. Cincinelli was in a dorm like room with bunk beds and she could not leave her bunk for hours on end. This was tantamount to being placed in solitary confinement for almost a full year - over 90% of every waking hour while at the MDC. Her access to commissary was substantially limited, all legal visits were suspended until recently and even to this day they are on an appointment basis only.[14] For much of this time, Ms. Cincinelli was not able to purchase basic health needs such as soap, or feminine hygiene products. For several months, access to phones was extremely limited and the vital contact with family members was sporadic as all social visits were suspended until recently and have since resumed on a limited basis.

Ms. Cincinelli has been unable to see her son since her arrest and has only seen her daughter on a few occasions since the onset of the pandemic. Also, during this time, Ms. Cincinelli lived with the possibility of contracting the COVID-19 virus. While it appears that we are now recovering from the pandemic as the rate of vaccinations increases, the fact remains that prisons are still operating in a restrictive manner. We submit that the Court should take these "unusually arduous conditions" into consideration in determining the appropriate sentence in this case.

Moreover, and in a very personal context, Ms. Cincinelli was in prison and could not attend the funeral of her dearly beloved brother, Sal. The undersigned had to schedule a visit in order to deliver the news to her given the possibility that Ms. Cincinelli would learn of her brother's death

---

[14] While the visit officers do their best to facilitate visits in the "old" building where female inmates are housed, these visits are riddled with hour long waits for staff to be assigned and arrive at the building before scheduled visits can take place.

in the news. She mourns the loss of her brother to this day, and she is eternally grateful to Sal's family for their continued support of her.

While we understand that prison is restrictive, the conditions resulting from the pandemic were not contemplated or taken into consideration as a matter of common law or by the Sentencing Commission. They have taken and will continue to take a far more onerous physical, mental and emotional toll on sentenced individuals than non-pandemic incarceration ever contemplated.

We ask that the Court consider Ms. Cincinelli's incarceration during the pandemic in determining the appropriate sentence in this case.

### E.  Remaining Factors of 18 U.S.C. §3553(a)

As Your Honor reflects upon the entirety of the person being sentenced, we ask the Court to consider that the requested sentence of time served will reflect the seriousness of the offense, promote respect for the law, provide just punishment and avoid unwarranted sentencing disparities. We also ask this Court to consider the entirety of Ms. Cincinelli's life – a life that, save the circumstances surrounding the instant conduct, was unblemished and marked by service to her country and community, and by love and sacrifice for her family and friends.

***Sentencing Disparities***

With regard to sentencing disparities, while we understand that comparing any one case to others is an imperfect exercise, it is nevertheless informative. As reflected in the Sentencing Commission's Sourcebook[15] of the 2,439 defendants sentenced in the Second Circuit in 2020, 727 defendants (29.8%) received a sentence within the guidelines range while 1,171 defendants (48.0%) received a variance. Similar statistics are reflected for sentences imposed in the Southern

---

[15] *See* United States Sentencing Commission, *2020 Annual Report and Sourcebook of Federal Sentencing Statistics*, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf

and Eastern Districts of New York. In the Eastern District in 2020, of the 360 defendants sentenced, 159 defendants (44.2%) received a sentence which varied from the applicable guideline range. These variances were predicated on the *Booker* decision and consideration of the factors delineated in 18 U.S.C. § 3553(a). As the graph below illustrates, the average sentence of imprisonment for an "administration of justice offense" for which obstruction of justice falls within was 11 months, far less than that already served by Ms. Cincinelli.[16]



**Average and Median Sentence Length**
Fiscal Year 2020

The figure includes the 542 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
FILTER:
Fiscal Year: 2020; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Administration of Justice; Guideline: All; Drug Type: All; Sentencing Zone: All; Criminal History: All; Career Offender Status: All

---

[16] *See* United States Sentencing Commission, *Interactive Data Analyzer, Sentencing Outcomes*, https://ida.ussc.gov/analytics/saw.dll?Dashboard

***General and Specific Deterrence***

The requested sentence of time served can and will provide adequate general and specific deterrence. The empirical evidence strongly suggests that there is little relationship between the length of a sentence and general deterrence, regardless of the type of crime. *See* Andrew Von Hirsch, *et al.*, *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) concluding that "correlations between sentence severity and crime rates ... were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects." *See also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice Review: A Review of Research 28-29 (2006) "[i]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects ... Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."

Based upon this research, while we appreciate the need for general deterrence, it appears to be satisfied in the *certainty* of punishment, not necessarily its severity. *See* Steven N. Durluaf & Daniel S. Negin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y 13, 37 (2011); *see also*; Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment* (2010).[17] Given the time Ms. Cincinelli has already spent in prison and the  collateral consequences which have ensued, we submit that a sentence which exceeds the time served by Ms. Cincinelli will not serve the purpose of enhancing general deterrence.

---

[17] Valerie Wright, Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment (2010)*,        https://www.sentencingproject.org/publications/deterrence-in-criminal-justice-evaluating-certainty-vs-severity-of-punishment/

With regard to specific deterrence, beyond the incapacitation precipitated by lengthy incarceration, there is little apparent correlation between recidivism and a term of imprisonment. *See* David Weisburd, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes,* 33 Criminology 587 (1995). In fact, it appears that among low-risk offenders, recidivism may, to a limited extent be fostered, not prevented by lengthy imprisonment:

> Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism.

Wright, *supra*, at 7.

Ms. Cincinelli is a low-risk offender for whom additional incarceration is not necessary to achieve specific deterrence. Research indicates that low-risk offenders with no criminal history points have a low recidivism rate. The United States Sentencing Commission found that offenders with zero criminal history points have a recidivism rate of 11.7% compared to a 22.6% rate for offenders with one criminal history point and 36.5% for offenders with two or more criminal history points.[18] Ms. Cincinelli is painfully aware of the ramifications which ensue from criminal conduct. She has been dramatically impacted from this arrest and conviction and has done her utmost to atone for her conduct and to rehabilitate herself. There is, we submit, no benefit in terms of specific deterrence in further incarceration. The sooner she is reunited with her family and society, the more fruitful her continued rehabilitation will be.

---

[18] *See* United States Sentencing Commission, Recidivism And The "First Offender", https://www.ussc.gov/research/research-publications/recidivism-and-first-offender

***Need to Protect the Public***

We anticipate that the Government and the Court will address the need to protect the public. To be sure, up until the events in this case, the public never needed protection from Valerie Cinincelli. Indeed, it was Ms. Cincinelli who protected the public for twelve years as a police officer and New York Guardswoman. Notwithstanding her words with Dirubba, she never intended or believed that anyone would be harmed. Her reaction upon hearing of the alleged murder of Mr. Carvalho could not possibly speak louder as to her true intent.

In this Court's decision denying bail pending sentence, Your Honor commented that nothing has changed with regard to previous findings that Ms. Cincinelli had demonstrated a strong resentment to the alleged victims, lacked impulse control and remorse and had not been candid with the Court and compliant with Family Court directives. We address each of those issues below.

As to her anger, Ms. Cincinelli understands that she needs to better manage her anger and intends to participate in anger management therapy. As is clear from her letter, she has let go of her anger towards others and now focuses on her own responsibility for the position she is in. She understands that she allowed her anger and emotional distress to steer her in a destructive way and that this resulted in the awful language that she spewed and for which she readily takes responsibility for. Rather than simply put that period in her life behind her, she seeks to further understand it and consciously work to avoid any repetition of it. The Department of Probation recommends anger management and Ms. Cincinelli welcomes that opportunity and intends to combine it with a therapeutic environment to address her previous destructive relationships.

As for concerns about a lack of impulse control, Ms. Cincinelli has been evaluated by Dr. Mark Mills in the past two months. We attach his report herewith for the Court's review. *See* Exhibit OO, Report and Resume of Mark J. Mills. We asked Dr. Mills to evaluate Ms. Cincinelli relating to these issues at the present time. Dr. Mills' conclusion, is that "Ms. Cincinelli's

46

psychiatric evaluation reveals that she is not psychotic, does not have a prior history of criminal or antisocial activity or any of the usual antecedents to such activity. Additionally, she is neither impulsive nor aggressive despite her brief action in the past." *Id.*

These conclusions, based upon scientific tests designed to eliminate any form of malingering or manipulation, are entirely consistent with the person Ms. Cincinelli was during the years leading up to the events surrounding this case. To the extent that the Court is concerned with any ill will or impulsivity on Ms. Cincinelli's part, we hope that this evaluation and the balance of this submission will persuade the Court that Ms. Cincinelli has acknowledged her conduct, accepted responsibility for it, and has done her best to rehabilitate herself and further develop the tools she needs to return to society as an emotionally healthy and loving mother.

With respect to Ms. Cincinelli's non-compliance with the Family Court order, she readily admitted that she disobeyed the order. However, we ask the Court to understand the circumstances under which she did so. Ms. Cincinelli, through counsel in the divorce case, was permitted to participate in calls with her son and the child psychologist assigned to the matter. We had gone to great lengths to have the counselor at the MDC arrange for her to make the call. One call was made in the counselor's office but the counselor thereafter refused to facilitate the call despite Judge Goldstein's requests to the facility. As the counselor at the MDC would not facilitate the call or give Ms. Cincinelli access to a regular phone, Ms. Cincinelli tried calling the toll free 877 number used for the calls from the inmate phone several times. The call would not go through, and she called her daughter directly to facilitate the call with her son. We had been attempting to facilitate these calls for months. The Court intervened with the MDC to no avail. She was trying to facilitate the same conference call that had been scheduled but could not use the number that she was given. This was an unequivocal mistake on her part and she understands this completely.

This situation was addressed in family court and the calls were resumed as scheduled. Dr. Favaro, the child psychologist who has been monitoring the calls has indicated that Ms. Cincinelli has been fully compliant and cooperative since. This Court need not worry that Ms. Cincinelli will ever disobey any order or condition imposed by Your Honor as a part of her sentence. She fully understands the meaning of strict adherence to any conditions imposed by the Court and she would never risk being returned to prison on a violation of her release and again being separated from her children.

### *Conclusion*

This has been a long and troubling journey for all involved. Ms. Cincinelli fully recognizes how ugly, vile and just plainly wrong the language she used was and she fully accepts responsibility for the obstruction of justice to which she has pled. We have sought to convey to this Honorable Court the extraordinary circumstances in which this event occurred. We have done this in an attempt to prove to Your Honor that this was aberrational behavior by a woman who had otherwise lived an honorable and law-abiding life and there is simply no likelihood that it will be repeated. This is not intended to excuse her conduct or minimize her crime, but rather to place it within the context of her entire life. It is these details which inform that "uniform and constant" principle "that every convicted person [be considered] as an individual and every case as a "unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue*." United States v. Jones*, 531 F.3d 163 (2d. Cir. 2008), *citing*, *Koon v. US*, 518 U.S. at 113, 116 S.Ct. 2035.

We remain grateful to the Government for evaluating the evidence with us and ultimately arriving at the fair disposition of this case. We now respectfully ask this Court to balance the

mitigation and magnification in this case and determine a sentence which is sufficient, but not greater than necessary to achieve the goals of punishment.

As such, we respectfully ask that the Court sentence Ms. Cincinelli to time served and supervised release with conditions that will assure the Court of adequate monitoring and compliance with all Court directives. We are absolutely confident that Ms. Cincinelli will continue on her rehabilitative path and once again be an asset to society.

Thank you for your courtesy and consideration.


Dated:          October 18, 2021
                New York, New York

                                                    Respectfully submitted,

                                                    _____/s/_____

                                                    JAMES KOUSOUROS, ESQ.

c.c

        Honorable Joanna Seybert

        Anthony Bagnola
        Catherine Mirabile
        Assistant United States Attorney

        Valerie P. Cincinelli