

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:CMM/AXB
F. #2019R000720

*610 Federal Plaza*
*Central Islip, New York 11722*

October 26, 2021

By ECF

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    United States v. Valerie Cincinelli
                  Criminal Docket No. 19-245 (S-1) (JS)

Dear Judge Seybert:

        The government respectfully submits this letter in connection with sentencing in the above-captioned case. On April 16, 2021, the defendant Valerie Cincinelli (the "defendant" or "Cincinelli") pled guilty before Your Honor to Count Three of a three-count indictment, charging her with obstructing a federal grand jury investigation of a murder-for-hire plot in which she participated, in violation of 18 U.S.C. § 1512(c). As set forth in the Presentence Investigation Report ("PSR"), the defendant's advisory Guidelines range is 46 to 57 months' imprisonment. (See PSR, ¶ 75).

        For the reasons set forth herein, the government respectfully submits that an above-Guidelines sentence of 60 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing in this case. In particular, an above-Guidelines sentence is necessary to reflect (1) the seriousness of the defendant's conduct, (2) her flagrant disregard both for the law generally, but also her position as a sworn law enforcement officer specifically, and (3) the need for specific and general deterrence. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C). The defendant's requested sentence of time-served is insufficient to account for the violent nature of her crimes and her brazen acts, undertaken while still a uniformed police officer, to obstruct justice. Because these factors are simply not quantified in the applicable Guidelines, a more severe custodial sentence is warranted.

I.      Background

    The PSR accurately summarizes the offense conduct. (See PSR, ¶¶ 2-9).

    A.      The Murder-For-Hire Plot

    In May 2019, the Federal Bureau of Investigation ("FBI") was informed that the defendant, then a New York City Police Officer, was plotting to have two people murdered: her estranged husband, Isaiah Carvalho, with whom she was going through divorce proceedings, and the teenage daughter of her longtime romantic partner John Dirubba. (PSR, ¶ 2). In particular, Dirubba informed the FBI that, sometime in early 2019, the defendant asked him to hire a hitman to murder both Carvalho—to prevent him from receiving a portion of her police pension in the divorce—and Dirubba's teenage daughter—essentially out of sheer jealousy and personal hatred. (PSR, ¶ 3).

    To that end, between February 2019 and May 2019, the defendant and Dirubba discussed the murder-for-hire plot both in person and by cellphone. Some of the conversations were consensually recorded at the direction of the FBI. (PSR, ¶ 3). Audio and video recordings of the defendant, and corresponding transcripts, were previously provided to the Court, most recently as Exhibits E-4 through E-10 to the government's April 23, 2021 opposition to the defendant's request for bail; the government incorporates those exhibits by reference here. (See ECF #90). As discussed in greater detail below, the defendant was captured on audio and video recordings not only planning the murders themselves, but also practicing her alibi and destroying evidence of her involvement upon being advised that her husband's murder had supposedly been carried out.

    B.      The Recordings

    The audio and video evidence in this case—none of which is disputed—reveal the stunning detail in which Cincinelli plotted the murders. Contrary to the defendant's assertions, the recordings leave little doubt that the defendant was determined to have her husband and her boyfriend's teenage daughter killed by a hitman. Moreover, the recordings are conclusive proof of her own actions in destroying evidence to avoid detection by law enforcement.

    For example, on May 8, 2019, as described in the government's earlier submissions, Dirubba was recorded telling the defendant "It's going to happen this weekend," to which the defendant replied, "I hope so." (See PSR, ¶ 4). That the defendant was serious about the plot was apparent from her frustration that the murders had not yet been completed. Thus, on May 8, 2019, when Dirubba stated, with respect to the murders, "It's going to be done," the defendant responded, "Okay, well tell me that when it's done, how about that? 'Cause you say that every weekend." (Id.). In addition, the following exchange was recorded on that date:

    Cincinelli:   Cause like we've discussed this for like a year now.
                  So I don't understand, like . . .

2

> Dirubba: No, we discussed you didn't like her, you didn't like [my daughter] at all, you discussed that, but this is a serious fucking matter right now, that's the problem, and it's going to be done.
>
> Cincinelli: Sounds like you have a problem with it. I don't have a fucking problem with it.

Several days later, on May 13, 2019, Dirubba advised the defendant that the supposed hitman did not want to murder his daughter near her school, to which the defendant responded, "Ok, so she leaves school, you said he knows exactly where she lives, right? . . . So, what's the problem?" (See PSR, ¶ 5).

The pair also specifically discussed ways to minimize suspicion and evade law enforcement. On May 8, 2019, for example, Dirubba stated, "I think it's very suspicious on one fucking weekend they're both dead," to which the defendant suggested staggering the murders to avoid rousing suspicion, telling him to "take care of yours and then wait a month." In that regard, they workshopped false alibis for the murder. (See PSR, ¶ 4). On May 8, 2019, the following exchange was recorded:

> Dirubba: Don't you think they're going to be looking for me afterwards asking me fucking questions, "Oh your daughter was just killed, uh, where are you?" And then you're going to get a phone call, "Your soon-to-be-ex-husband . . . was just killed, where the fuck, where are you?"
>
> Cincinelli: Okay and I'll say wherever the fuck I'm going to be.

(Id.)

Several days later, on May 13, 2019, the defendant and Dirubba crafted a false narrative to explain Carvalho's murder, the same fictitious story the defendant later provided to Suffolk County Police Officers when, as part of a ruse in furtherance of the investigation, they notified her of her husband's death, namely, that Carvalho sold fireworks and, therefore, his death may have resulted from a robbery or bungled fireworks sale:

> Dirubba: Killed over fireworks? . . .
>
> Cincinelli: No, the money that you have from selling them.
>
> Dirubba: What like somebody robbed him?
>
> Cincinelli: Exactly.

(See PSR, ¶ 6).

3

The specificity of these discussions undercuts the post hoc rationalization contained in the defendant's sentencing memorandum, namely, that the recordings captured moments of unserious venting. In actuality, any clear-eyed review of defendant's statements compels the conclusion that she was not venting—she was plotting. Indeed, when Dirubba reminded the defendant that the fireworks alibi would only apply to her husband because his teenage daughter "doesn't sell fireworks," the defendant impatiently replied, "No, she's just a whore . . . Run her the fuck over, how about that?" (Id.)

Notably, on May 17, 2019, it was Cincinelli, not Dirubba, who initiated a discussion about status of the planned killings, demanding an assurance from Dirubba that the murders would happen that weekend and again reiterating the false scenario that Carvalho may have been killed over fireworks:

> Cincinelli: So I guess nothing happened.
>
> Dirubba: What's that?
>
> Cincinelli: I guess nothing happened.
>
> Dirubba: With what?
>
> Cincinelli: Either person.
>
> Dirubba: Isaiah or [my daughter]?
>
> Cincinelli: Yeah.
>
> Dirubba: I didn't hear anything yet like nobody texted me yet.
>
> . . .
>
> Cincinelli: . . . I know for a fact [my husband] was out all night building fireworks 'cause that's what him and his cousin do . . .
>
> Dirubba: Maybe he'll, uh, run into the wrong person buying fireworks. Ha. Maybe a robbery went bad.

(See PSR, ¶ 7).

Contrary to her current contention that Dirubba somehow manipulated her, it was Cincinelli who attempted to force Dirubba's hand by refusing to vacation with him unless the murders were completed: "Tomorrow's Saturday, and I'm not going [upstate] unless you promise me everything's gonna happen, happens."

4

During that conversation, the defendant and Dirubba again discussed their respective alibis for the planned killings. The defendant, drawing on her experience as a police officer, told Dirubba it was good he had slept in his car in a Dunkin' Donuts parking lot the night before because his whereabouts could be confirmed:

> Dirubba: . . . Only thing I got to worry about is I slept in my fucking car.
>
> Cincinelli: Where, I'm sure under a camera?
>
> Dirubba: Some Dunkin' Donuts parking lot.
>
> Cincinelli: Alright, well there's cameras there. And we were texting most of the night. Towers ping.

(Id.). The defendant further opined that the fact that she and Dirubba had been fighting would distract law enforcement from looking at them:

> Cincinelli: Me and you were fighting about money anyways; it makes it look even better that me and you were fighting and I'm telling you "fuckin' leave." Like, why would I want to do anything to him, when me and you were even fighting. Like, at least he's giving me child support, it makes no sense.

It bears emphasis that, approximately 30 months ago, Cincinelli had already begun auditioning one of the arguments she now advances in her sentencing memorandum, namely, that the apparent discord between herself and Dirubba—including and especially instances where she threatened to evict him from her home—would somehow work to her benefit in avoiding responsibility for her crimes. (See, e.g., Def. Memo at 23 (recalling "[t]he first time Ms. Cincinelli threatened to kick Dirubba out of the house"); id. at 31 (asking the Court to consider that "Ms. Cincinelli repeatedly kicked Dirubba out of her home")).

As relates specifically to the crime of conviction, audio and video recordings depict the defendant reacting to a staged notification by Suffolk County Police Officers that her husband had been found dead. During that interaction, the defendant never asked the officers how her husband died; provided unsolicited explanations for her own whereabouts; and volunteered the same information concerning the risks of her husband's fireworks business that she had practiced with Dirubba. That Cincinelli's reaction to learning this news was pure theatre is apparent from her feigned dismay and fabricated tears. Indeed, immediately after

5

the officers left her home, the defendant was recorded making a series of patently incriminating statements that laid bare her consciousness of guilt.[1] (See PSR, ¶ 8).

For example, when Dirubba suggested that the defendant falsely tell the officers that he (Dirubba) had slept on her couch the night before, the defendant replied, "I'm not . . . getting caught lying about something stupid and then getting caught for something bigger," i.e., the murder-for-hire. (Id.). And when an FBI agent, posing as the hitman, sent Dirubba a photograph purporting to show the defendant's murdered husband, the defendant, again, drawing on her experience as a police officer, deleted the image, stating "they [the police] are going to get these fucking texts, you dumbass. They can subpoena these photos. . . .You don't think that they're gonna subpoena mine and your text messages? Is this [hitman] [a] fuckin' retard?" (Id.).

To the extent the defendant displayed any signs of distress following the death notification, that reaction was the result of the defendant's concern for herself—not over the death of either of her intended victims. Indeed, following the death notification on May 17, 2019, the defendant, thinking solely of herself and her own self-preservation, was recorded saying "I'm telling you, they're gonna think it's me and I'm gonna fuckin' somehow go to jail, lose both my kids and everything, that's what's gonna happen." As described below, even at this late stage, Cincinelli continues to express concern solely for herself, rather than any semblance of remorse for others impacted by her actions.

C. Text Messages and Internet Search History

While the defendant claims that she and Carvalho had largely settled their divorce without any issues and that the divorce proceedings were not particularly contentious (see Def. Mem. at 20), the defendant's own internet search history paints a very different picture. Amidst the conversations described above, evidence extracted from the defendant's cellphone revealed that, in mid-April 2019, she conducted numerous internet searches

---

[1] Contrary to Cincinelli's current contention that she did not believe Dirubba had actually hired a hitman to carry out the murder (see Def. Mem. at 30), the recordings reveal otherwise. As discussed in detail above, the defendant had extensive and detailed conversations concerning the hitman. And regardless of whether the hitman was paid in gold coins, as Dirubba initially reported (PSR, ¶ 3), in or in some other manner, the recordings evidence that the defendant, in fact, believed a hitman had been hired. Indeed, throughout the recordings, the defendant repeatedly expressed her understanding and expectation that Dirubba had hired someone to carry out the killings. On May 17, 2019, when questioning Dirubba about the status of the murders, Dirubba suggested that the hitman was hiding, to which the defendant replied, incredulously, "Hiding?! I thought he was a professional, why would he be hiding." Later in the same conversation, when Dirubba lamented that he did not have enough money to pay the hitman an additional $3,000 for the second murder, the defendant retorted "Doesn't [the hitman] know Saturday you're getting all your money?" As these discussions make plain, the defendant was under the belief that the hitman had been hired and payment arrangements had been made.

6

concerning how her husband's death would affect his standing to receive a distribution of her police pension. (See ECF #90, Exhibit E-3; see also PSR, ¶ 7). For example, on April 19, 2019, the defendant sent the following text: "I'm really pissed off w this pension shit." (ECF #90, Exhibit E-2). That same day, she repeatedly conducted internet searches for "if your ex dies do you get your whole pension." (Id., Exhibit E-3).

Moreover, the defendant's internet searches were not limited to Carvalho. The recordings also reveal the defendant's deep-seated jealousy and resentment towards Dirubba's minor daughter, who, at just 13 years old, Cincinelli described as "dickrider," "cunt," "slut," and "whore." They also chronicle the defendant cyberstalking the young girl and tracking her whereabouts in the lead-up to the anticipated murder. On May 8, 2019, for example, the defendant and Dirubba were recorded checking the daughter's Instagram account to determine her likely location. Subsequently, on May 13, 2019, the defendant was recorded admitting to searching the internet for the location of a restaurant where she had seen the teenager on social media. On that same date, Dirubba directed the defendant to "delete all that shit off your phone," i.e., her visits to his daughter's social media pages, to which the defendant replied, with respect to the murder, "then how are you going to know when anything's done?" Troublingly, Cincinelli's internet search history revealed that, between January 2019 and April 2019, she conducted approximately 130 separate internet searches for Dirubba's daughter. (Id., Exhibit E-3).

### D. The Defendant's Arrest, Indictment and Guilty Plea

On May 17, 2019, federal agents arrested Cincinelli for using a facility of interstate commerce in furtherance of one or more murders, in violation of 18 U.S.C. § 1958(a). (See ECF #1). On May 29, 2019, a grand jury in the Eastern District of New York returned a three-count indictment, charging the defendant with two counts of murder-for-hire and one count of obstruction of justice. (ECF #9). On July 16, 2020, the grand jury returned a superseding indictment charging the same offenses and expanding the temporal scope of Count One. (ECF #69). On April 16, 2021, pursuant to the CARES Act, the defendant appeared via videoconference before this Court and pleaded guilty to obstruction of justice, in violation of 18 U.S.C. § 1512(c). (ECF #89).

## II. The PSR and Guidelines Calculation

On August 30, 2021, the United States Probation Department disclosed the PSR, which set forth the following Guidelines calculation:

| | |
|---|---|
| Base Offense Level (§§ 2J1.2(c)(1), 2X3.1(a), 2E1.4) | 26 |
| Less: Acceptance of Responsibility (§ 3E1.1) | - 3 |
| Total Adjusted Offense Level | 23 |

(See PSR, ¶¶ 14-23). Based on a total offense level of 23 and a Criminal History Category I, the advisory Guidelines range is 46 to 57 months' imprisonment. (See PSR, ¶ 75). This is

7

consistent with the calculation set forth in the plea agreement, and the defendant agrees with the Guidelines calculation. (See Plea Agreement; Def. Mem. at 2).

Due to, among other things, the seriousness of the defendant's conduct, the Probation Department recommends a sentence of 54 months' imprisonment. Indeed, as the Probation Department noted, "[t]he defendant['s] willingness to have two people killed, including a minor, is simply reprehensible and deserving of a substantial level of punishment." (See Probation Department's Sentence Recommendation, dated August 30, 2021).

III. Argument: An Above-Guidelines Sentence is Warranted in This Case

The Court's "starting point and the initial benchmark" when determining the defendant's sentence should be the advisory Guidelines range of 46 to 57 months' imprisonment. Kimbrough v. United States, 552 U.S. 85, 101 (2007). In her sentencing submission, the defendant urges this Court to issue a below-Guidelines sentence of time served, essentially 30 months' imprisonment. Several factors militate in favor of an upward variance, however, and, as such, the government recommends an above-Guidelines sentence of 60 months' imprisonment. The government submits that such a sentence is required to reflect (1) the seriousness of the defendant's conduct, (2) her flagrant disregard for the law, and (3) the need for specific and general deterrence. See 18 U.S.C. §§ 3553(a)(1), (a)(2)(A)-(C).

A. The Seriousness of the Offense Mandates an Upward Variance

As an initial matter, as set forth above and in the PSR, the offense underlying the defendant's obstruction of justice is murder-for-hire. The defendant obstructed an investigation of a brazen plot to have two people, one of whom was a teenager, murdered by a hitman. The motive for this plot was jealousy and hatred; the motive for the subsequent obstruction, self-preservation. The seriousness of this offense mandates an upward variance. See 18 U.S.C. § 3553(a)(1), (a)(2)(A).

Obstructing justice—and plotting to murder two people—are serious crimes. The defendant took deliberate and intentional steps to advance the scheme to have her victims killed and purposefully destroyed evidence to avoid detection by law enforcement. Far from mere banter, venting or a one-off conversation, Cincinelli plotted the murder of two individuals over the course of several months. Indeed, she is heard on multiple recordings, spanning several days, and initiating conversations about the killings. Her actions were calculated, intentional and persistent. This conduct is particularly egregious considering Cincinelli was a uniformed NYPD officer at the time of her crimes.

Although the defendant did not plead guilty to murder-for-hire, there is no limitation on the Court's discretion to consider information concerning the defendant's involvement in that crime. See 18 U.S.C. §§ 3553(a)(1), 3661; see also United States v. Reese, 33 F.3d 166, 174 (2d Cir. 1994) ("hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in an acquittal" may be considered in sentencing) (emphasis supplied). This includes the uncontroverted evidence that the defendant

was recorded on multiple occasions plainly talking about having two people murdered, one of whom was a teenager; that the defendant was recorded discussing her alibi and discussing ways to make the murder of her husband look like a bungled robbery; and that the defendant was researching online how the death of her husband would impact his standing to receive a portion of her pension in the divorce. Under these highly unusual circumstances, a significant term of imprisonment is warranted.

B.  The Defendant Continues to Minimize Her Conduct

While the government is not contesting the downward Guidelines adjustment for acceptance of responsibility, it is germane to this Court's analysis that Cincinelli apparently refuses, still, to accept the full scope of her criminal conduct.

Despite acknowledging her voice and likeness on the recordings, Cincinelli claims that her statements somehow did not reflect her "intentions" and that she "was merely venting [her] entire lifes [sic] frustrations." (See Def. Mem. at Exhibit E).[2] Further, throughout her sentencing memorandum, the defendant largely lays blame for her own criminal conduct at John Dirubba's feet, readily admitting that her submission may be "construed as one of shifting blame." (See Def. Mem. at 32-33; see also id. at 6 ("[w]e seek to explain, not excuse.")). Disappointingly, she is exactly right—her sentencing memorandum is little more than a series of attacks—against Dirubba, Carvalho and even Dirubba's minor daughter—for the situation in which she has found herself. (See, e.g. id. at 6-7, 20-28 (Dirubba created the circumstances that caused her to behave criminally); 25-27 (Dirubba and Carvalho

---

[2] The defendant also submitted an expert report, dated October 18, 2021, from Mark J. Mills, JD, MD, "to persuade the Court that Ms. Cincinelli has acknowledged her conduct, accepted responsibility for it, and has done her best to rehabilitate herself and further develop the tools she needs to return to society. . . " (Def. Mem. at 46-47; see also Exhibit OO). This report should be given no weight. Aside from the fact that it was turned over as part of a collection of exhibits, with no notice to the government, the report, most importantly, suffers from a flawed analysis based on the defendant's self-serving version of events. As an initial matter, it is unclear of Dr. Mills ever actually received and/or listened to the recordings; he certainly does not acknowledge doing so in his report. Rather, his account of the underlying offense is based exclusively on the defendant's subjective telling. Dr. Mills unqualifiedly adopts the defendant's account as fact, despite acknowledging that (i) his ability to assess the defendant's candor was greatly degraded; (ii) as a law enforcement officer, the defendant "would have known what information tended to be exculpatory[;]" and (iii) testing does not provide specific insight into what occurred in 2019. (Id., Exhibit OO). Notably, with respect to the testing itself, Dr. Mills administered the same test (MMPI) as Dr. Barry Rosenfeld, who was appointed by the Court to conduct an independent evaluation into the defendant's dangerousness. Dr. Rosenfeld found that Cincinelli's responses to the test indicated a defensive approach to testing and that, as described more fully below, she was remorseless, lacked impulse control and "presented herself as unrealistically virtuous." (See ECF #90, Exhibit H).

9

plotted against her); 27-28 (Dirubba and his daughter conspired to steal her money)). Far from fully accepting responsibility, the defendant instead points to others' conduct to excuse her own criminality.

To be sure, the evidence outlined above makes clear that Cincinelli was, at all relevant times, an active and willing participant in the murder-for-hire scheme. And despite her numerous and repeated protestations to the contrary, responsibility for Cincinelli's words and actions cannot lie with Dirubba, his daughter or Carvalho. It is the defendant's voice on the recordings, concocting specific plans for the killings and elaborate alibis to throw her fellow police officers off her proverbial scent. It was the defendant who repeated for those officers a rehearsed explanation for Carvalho's murder. It was the defendant who Googled the impact Carvalho's murder would have on her pension. And it was the defendant who studied the comings and goings of Dirubba's 13-year-old daughter on social media. It was the defendant who, in desperate effort to avoid arrest, destroyed incriminating evidence. Ultimately, it is the defendant—not Dirubba, Carvalho or anyone else—who must face the consequences.

While the defendant claims to be taking responsibility for her actions, viewed in the context of the record as a whole, those words ring hollow.[3] Notably, as this Court is aware, in July 2019, a court-appointed psychologist found the defendant to be remorseless and lacking impulse control.[4] Now, more than two years later, her October 2021 sentencing submission likewise lacks any indicia of remorse as to the impact her actions have had on others, including her intended victims. Rather, Cincinelli's letter to the Court is replete with examples of ways in which her criminal conduct has unfairly impacted her.[5] Nowhere in the

---

[3] As the Court is aware, even while in custody, the defendant made provably false statements to former United States District Judge Sandra J. Feuerstein in an attempt to secure release and violated pretrial directives of a state family court judge. See id. § 3553(a)(1).

[4] The court-appointed psychologist also found that the defendant "presented herself as unrealistically virtuous." The government submits that Cincinelli's sentencing submission tracks with this observation.

[5] In this regard, Cincinelli laments that she has missed important moments in her children's lives and claims that her incarceration has prevented contact with her son. (See Def. Mem., Exhibit E). As the Court knows, though, it was the defendant's own actions, and her inability to follow direction from the Nassau County Family Court, that resulted in her limited contact with her son. More fundamentally, the defendant's reliance on her status as a mother should not be considered a mitigating factor. See, e.g., United States v. Vera Ramos, 296 Fed. Appx. 201, 203-04 (2d Cir. Oct. 21, 2008) (affirming Guidelines sentence despite defendant's "'difficult upbringing' and 'very substantial family responsibilities'" and noting district court's observation that such circumstances are "almost universal" among defendants in similar cases); United States v. Madrigal, 331 F.3d 258, 260 (2d Cir. 2003) (noting that the defendant

10

defendant's sprawling 54-page memorandum or 41 individual exhibits does she express remorse, regret or sympathy for the victims or even acknowledge how dangerously close her own "venting" came to causing a horrific crime. (See Def. Mem. at Exhibit E).

In determining an appropriate sentence in this case, the Court should consider the defendant's lack of remorse and unwillingness to accept responsibility for her actions. See United States v. Sejdaris, 534 F. App'x 23, 25 (2d Cir. 2013) (affirming district court's reliance on "protestations of innocence to be an indication of likely recidivism"); United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (finding defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); United States v. Martinucci, 561 F.3d 533, 535 (2d Cir. 2009) (affirming above-Guidelines sentence where district court considered, among other things, the defendant's lack of remorse); United States v. Li, 115 F.3d 125, 135 (2d Cir. 1997) (affirming district court's upward variance based on the defendant's "manipulative conduct and unwillingness to accept responsibility—which persisted throughout her criminal proceedings and were viewed as having been exhibited once again during her comments at sentencing").

  C. <u>Nothing in the Defendant's Background Provides Compelling Mitigation</u>

The circumstances of the defendant's upbringing, family structure, and lack of criminal history, should certainly be considered, but they must also be balanced with the nature and gravity of the instant offense. In fact, the defendant's intelligence, education, and employment as a law enforcement officer make her crime all the more inexcusable. Rather than being borne out of necessity or adverse circumstances, the defendant's criminality was motivated by pure greed and jealousy. The factors favoring an upward variance outweigh any mitigating circumstances in the defendant's background.

The defendant seeks to minimize her conduct by noting that she has no criminal history and argues that her criminal conduct was aberrant behavior as the result of her relationship with Dirubba. (See Def. Mem. at 6-7, 20-28, and Exhibit E). As noted above, however, the defendant's conduct extended over a period of months and is captured on several recordings and in her internet searches. The defendant is an intelligent woman, and her conduct was not a momentary aberration or lapse of reason. Nor does the defendant's lack of criminal history mitigate against a significant sentence. The applicable Guidelines range already reflects the defendant's limited criminal history, placing her in the lowest possible criminal history category. As such, her lack of criminal history does not merit an additional variance.

The defendant's history of public service does not alter this analysis. While her career in the NYPD was commendable, her status as a trained, uniformed police officer renders

---

mother's separation from her children, although unfortunate, was a common collateral damage of imprisonment).

11

her criminal conduct all the more egregious.  In that regard, inasmuch as the two-point enhancement for abuse of a position of trust does not apply under the specific facts and circumstances of this case, the Guidelines calculation fails to account for the defendant's employment as a law enforcement officer at the time of her crimes.  As such, the defendant's unique position of public trust demands greater scrutiny from the Court at sentencing, not less. See United States v. Kaye, 23 F.3d 50, 53 (2d Cir. 1994) (affirming upward departure where Guidelines did not capture the proper degree of harm or consequences of criminal conduct).

> D. The Need for Both Specific and General Deterrence is High

An above-Guidelines sentence is necessary to not only to deter the defendant from future crimes, but also to deter similarly situated individuals from engaging in such behavior.  Inasmuch as the defendant engaged in deliberate, premeditated conduct, her case presents a powerful opportunity to send a message of deterrence, not only to those who, like Cincinelli, would seek to justify criminal conduct by portraying themselves as victims of unhappy romances, but also to those, also like Cincinelli, who would abuse positions of public trust to commit bad acts and then use specialized knowledge and training as a law enforcement officer to conceal their crimes.  In fact, a below-Guidelines sentence in this case would only serve to embolden and incentivize those who wish to obstruct law enforcement and grand jury investigations, signaling that the potential benefit for such criminal conduct outweighs the risk.  This outcome would directly undercut one of the central goals of sentencing by encouraging, rather than deterring, similar behavior in the future.  It bears mentioning that the reason the murders did not happen was because Dirubba went to the FBI, as opposed to a hitman.  The defendant had the intent to kill and then obstruct the investigation.  A low sentence here would also fail to deter others from engaging in murder-for-hire plots.  A serious sanction is necessary to deter the defendant and others from participating in similar crimes of violence and the concealment thereof.

> E. The Proposed Upward Variance Would Not Be an Abuse of Discretion

Under the facts and circumstances of this case, the imposition of a 60-month sentence would not be an abuse of the Court's discretion.  The substantive reasonableness of any sentence—whether within or outside the Guidelines—is reviewable under an abuse-of-discretion standard.  Cf. Gall v. United States, 552 U.S. 38, 59 (2007) (noting that "if the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness . . . but if the sentence is outside the Guidelines range, the court may not apply a presumption of reasonableness").  Indeed, the Court has tremendous latitude in fashioning a just sentence, and deference is given to any "decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id. ("[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court").

12

Here, given the case-specific factors outlined above, the recommended 60-month sentence is well within the Court's broad discretion.[6] See, e.g., United States v. Erpenbeck, 532 F.3d 423 (6th Cir. 2002), cert. denied, 555 U.S. 997 (sentence of two concurrent terms of 300 and 60 months for bank fraud and obstruction of justice convictions, which represented an upward variance of 65 months from the Guidelines range, was not substantively unreasonable; district judge explained that an above Guidelines sentence was proper in light of the fact that the suffering and harm was not otherwise accounted for in defendant's sentencing); United States v. Mills, 917 F.3d 423 (4th Cir. 2019) (district court's application of statutory sentencing factors supported its conclusion that variance to 70-month sentence – almost double the estimated Guidelines – for being felon in possession of firearm was necessary to satisfy basic aims of sentencing; court considered the defendant's criminal history and particularly dangerous nature of circumstances involved in the charged offense); United States v. Martinez-Armestica, 846 F.3d 436 (1st Cir. 2017), cert. denied, 138 S. Ct. 64 (upward variance of 25 months not substantively unreasonable where district court considered statutory sentencing factors to distinguish defendant from ordinary brandisher of firearm); United States v. Lente, 759 F.3d 1149 (10th Cir. 2014) (district court's decision to vary upward from defendant's 46 to 57 month advisory Guidelines range and impose a 192-month sentence for involuntary manslaughter and assault resulting in serious bodily injury was substantively reasonable given the extreme recklessness of the act and resulting death).

Considering the totality of the circumstances delineated in 18 U.S.C. § 3553(a), the proposed upward variance is well within the range of "permissible decisions." United States v. Ingram, 721 F.3d 35, 43 (2d Cir. 2013) (when reviewing sentence for substantive reasonableness, Court of Appeals will not substitute its own judgment for district court on the question of what is sufficient to meet statutory sentencing considerations in any particular case, but will instead set aside district court's substantive determination only in exceptional cases in which district court's decision cannot be located within the range of permissible decisions).

F. The Pandemic Does Not Warrant a Below-Guidelines Sentence

The defendant's argument that she should receive a downward variance from the Guidelines range because she was incarcerated during the pandemic should be rejected. COVID-19 has undoubtedly had a significant impact on everyone's lives. In the face of the global pandemic, the MDC modified operations and adopted precautionary measures to

---

[6] The defendant's purported analysis of intra-District sentences is unpersuasive. (See Def. Mem. at 42-43). As Cincinelli readily concedes, comparing any one case to another is an "imperfect exercise." That is especially true given the highly specific and unusual facts of this case, none of which is even alleged to have recurred elsewhere in this District. For that reason, the defendant's apparent reliance on custodial sentences for "administration of justice offenses," is meaningless without knowing, for example, how many such offenses involved obstruction of violent crimes, intended violence against minor victims, and how many of the defendants were uniformed police officers at the time they committed their crimes. On those material data points, the defendant's papers are, not surprisingly, silent.

safeguard the health and safety of its inmates, staff and the community at large. As of May 2021, all BOP inmates, including those at the MDC, had been offered the COVID-19 vaccine, and the defendant was fully vaccinated as of February 9, 2021.

More fundamentally, though, the defendant's history of lying about her conditions of confinement—including in communications with the Court—speaks to the credibility of her claims. As the Court will recall, in a March 29, 2020 motion for bail, Cincinelli argued that, despite having no underlying health conditions that increased her risk of contracting COVID-19 or becoming seriously ill if she did, the pandemic nevertheless justified her pretrial release partly because she worked in the MDC laundry, where she washed other inmates' clothing "without proper personal protective equipment." By attributing the situation to "the BOP's careless procedures," the defendant implied that the staff at MDC had somehow failed to provide her with personal protective equipment in relation to her work, or in some other way that placed her "at grave risk of infection."

This claim, made in a filing to Judge Feuerstein, was revealed to be an utter fabrication when MDC staff confirmed that: (i) Cincinelli's work in the laundry was purely voluntary; (ii) inmates who were laundering dirty laundry were provided protective gowns, masks and gloves in relation to their work; and (iii) only two women in the facility handled the dirty laundry of other inmates and Cincinelli was not one of them. Given the patently false nature of her allegations regarding the conditions of confinement at MDC, Judge Feuerstein was compelled to ask whether defense counsel had "investigate[d] that claim, or did you take it at face value?" Id. at 4.

Under these circumstances, the defendant's generalized complaints regarding the conditions at the MDC do not warrant a downward departure. Considering the facts of this case and the factors set forth in 18 U.S.C. § 3553(a), a downward departure is not warranted.

IV.     Conclusion

For the reasons set forth herein, the government recommends an upward variance and an above-Guidelines sentence of 60 months' imprisonment. This sentence is sufficient, but not greater than necessary to achieve the goals of sentencing. See 18 U.S.C. § 3553(a)(2). The Guidelines simply do not quantity or capture the nature and gravity of the offense conduct, which represents a shocking disregard for the law by an NYPD officer.

Respectfully submitted,

BREON PEACE
United States Attorney

By:     /s/
        Catherine M. Mirabile
        Anthony Bagnuola
        Assistant U.S. Attorneys
        (631) 715-7850 / 7849

cc:     James Kousouros, Esq.  (by ECF & email)
        Gregory Giblin, United States Probation Officer (by email)